FORT WORTH CAVALRY CLUB, INCORPORATED, v. GEORGE H. SHEPPARD, COMPTROLLER.

No. 6682.   Decided May 29, 1935.
(83 S. W., 2d Series, 660.)

340

*Wm. A. Wade* and *Carl L. Phinney*, both of Dallas, for relator.

*James V. Allred*, former Attorney General, *Gaynor Kendall*, former Assistant Attorney General, *William McCraw*, Attorney General, and *Earl Street*, Assistant Attorney General, for respondents.

MR. JUSTICE CRITZ delivered the opinion of the court.

This is an original mandamus proceeding instituted in the Supreme Court by Fort Worth Cavalry Club, a domestic corporation, against George H. Sheppard, State Comptroller, to compel the issuance to relator of a state warrant in the sum of $1710.00.

It appears from the record that at some time, the record not disclosing the date, relator, as owner and lessor, and the State, acting through its Adjutant General, as lessee, entered into a purported written lease contract, by the terms of which the relator leased to the State, for a term of five years from September 1, 1931, certain real property located in this State, to be used as an armory in training and maintaining the State Militia. We gather from the record that the lease, by its terms, began on September 1, 1931, and continues for a period of five years from that date. Also such lease provides that either party may cancel the same by giving sixty days written notice to the other party. Under the terms of the lease it is stipulated that the State shall pay a rental of $285.00 per month. The contract contains the following express provisions, "The State

of Texas guarantees the payment of the rent for the above described property in accordance with this lease contract."

In accordance with the above written contract, and the orders of the Adjutant General, two troops of the Texas National Guard entered into possession and occupancy of the premises covered by the lease on September 1, 1931, and thereafter occupied the same for the ensuing six months, that is up to March 1, 1932. The State paid the stipulated monthly rental for the months of September, October, November and December, 1931, and January and February, 1932. These payments were made by warrants drawn by the Comptroller against the appropriation made by the 42nd Legislature for the Adjutant General's Department. This appropriation is a part of Ch. 286, Acts of such legislature.

In this connection it appears that the 42nd Legislature made the following appropriation for the Adjutant General's Department for the biennium ending August 31, 1933.

|  | "For the Years Ending | |
|  | August 31, 1932 | August 31, 1933 |
| "Telegraph, telephone, postage and stationery | $3,000.00 | $3,000.00 |

General maintenance and armories;

For pay transportation, subsistence and other expenses of military forces of the State when ordered on duty or when mobilized or when recruiting and organizing troops or when ordered on other military duties; providing for pay, transportation, automobile allowances, and expenses of officers on active duty, or while serving on Military Courts and Boards; providing for armory and storage facilities and organizations; providing for training, organizing, mobilizing, and subsistence, paying and equipping, preparing for muster into and out of Federal Service; providing for organizing, maintaining, and equipping school of instruction for officers or enlisted men; providing for books and supplies, providing for necessary clerical assistance and labor in storage rooms,

arsenals, armories, and all headquarters; providing for the maintenance, building, upkeep and repairs of roads, picket lines, and buildings at Camp Mabry, Mineral Wells, and Palacios; providing for the payment of insurance premium covering property belonging to the State of Texas; providing for transportation of stores, supplies, laundry and repairs of the uniforms and equipment; for hire, purchase, transportation, and subsistence of animals, for printing, stationery, postage, telephones, telegraph, for the purchase of stores, uniforms, arms and equipment for the Texas National Guard, and providing for other necessary expenses _____$272,500.00  $272,500.00"

The above item of appropriation is found on pages 672 to 673, ch. 286, Reg. Ses. 42nd Legislature, 1931.

At the time this contract was made there was available under the above quoted appropriation, money sufficient to pay the rentals provided by this and all other rental contracts of the Adjutant General's Department for the two years covered by such appropriation. Also in addition thereto there was sufficient money available under such appropriations to pay all other contracts of such department and all other expenses that could reasonably have been anticipated by such officer for such time.

About August 16, 1931, the Governor of Texas declared martial law in certain oil producing counties in East Texas, and ordered State troops therein. This action of the Governor created a very large and unforeseen expense in the operation of the Adjutant General's Department and thereby exhausted its appropriation for the year ending August 31, 1932, on February 29, 1932.

As already shown the State paid the rentals of $285.00 per month, in accordance with the above written contract up to and including the month of February, 1932. After the above quoted appropriation for the year ending August 31, 1932, was exhausted, the Governor approved certain deficiencies for the Adjutant General's Department but no deficiency warrants were ever issued to relator.

The National Guard troop continued to occupy the premises here involved for the months of March, April, May, June, July

and August, 1932. About April 1, 1932, the Adjutant General, acting on instructions from the Governor, sent to the relator the following instrument:

"Austin, Texas, April 1, 1932.
"THE STATE OF TEXAS

due
Fort Worth Cavalry Club, Inc.,
Fort Worth, Texas.

"Account Armory Rental for the month of March,
  1932, _____$285.00

"Issued in lieu of deficiency warrant; for presentation to the Claims Committee, 43rd Legislature.

"By order of the Adjutant General;
"H. H. Carmichael,
"Assistant Adjutant General.

"APPROVED:
"R. S. Sterling.
"Not good unless countersigned by H. H. Carmichael, Assistant Adjutant General, and the seal of the Adjutant General's Department affixed hereto."

The above instrument was mailed to relator, together with the following additional instrument:

"TO THE BUILDING OWNERS OF STATE-LEASED ARMORIES:

"There will be sent you each month for the remainder of this fiscal year, which ends August 31st, a certificate in lieu of State of Texas' Treasury Warrant that you have heretofore been receiving for armory rental. You are no doubt aware that conditions have arisen in this department, over which we have no control, placing us on a deficiency. This deficiency has been exhausted, and under the Statutes no other deficiency can be issued. The attached certificate has been approved by the Governor of Texas. Copies of these will be kept in this office, and the totals of these for March, April, May, June, July, and August will be presented to the Claims Committee of the Legislature the second week in January for payment.

"I earnestly solicit your cooperation in this matter, and know you will appreciate this condition. Beginning on September 1st, regular Treasury Warrants will be issued as heretofore.

"If this arrangement is not satisfactory, would appreciate you writing us at once.

"Yours very truly,
"H. H. Carmichael,
"Assistant Adjutant General."

With the permission of relator, and we presume under the above contract and other instruments just set out, the National Guard of this State used and occupied the premises here involved during the time from March to August, inclusive, 1932. About the first of each of these months the Adjutant General sent to relator similar instruments to the ones quoted. Relator accepted these instruments, and so far as shown by this record, made no effort to obtain deficiency warrants in place thereof. In fact we understand the Governor had already exhausted his constitutional and statutory power to approve deficiency warrants.

Finally relator, or someone for it, presented the above quoted instruments to the Claims Committee of the 43rd Legislature, and it approved them for the total sum of $1710.00, and included such sum as an item in S. B. 251, ch. 132, Acts Regular Session 43rd Legislature, 1933. The Act referred to passed both houses of the Legislature, and was approved by the Governor. It is now a law so far as valid.

After the Act last mentioned became effective relator demanded of the Comptroller the issuance to it of a warrant for the above amount. The Comptroller, acting on the advice of the Attorney General, refused such demand. This proceeding followed.

1   It is settled as the law of this State that under the provisions of section 44 of Article 3 of our State Constitution the Legislature is prohibited from appropriating State money to any "individual" on any claim, unless, at the very time the appropriation is made, there is already in force some pre-existing valid law constituting the claim the appropriation is made to pay a legal and valid obligation against the State. It is also settled that a private corporation is "any individual" within the meaning of the constitutional provision just mentioned. Finally, it is settled that by legal obligation is meant such an obligation as would form the basis of a judgment against the State in a court of competent jurisdiction, in the event the Legislature should permit it to be sued. Austin National Bank v. Sheppard, 123 Texas, 272, 71 S. W. (2d) 242; Austin National Bank v. Sheppard, 123 Texas, 280, 71 S. W. (2d) 246; Corsicana Cotton Mills v. Sheppard, 123 Texas, 352, 71 S. W. (2d) 247; Nichols v. State, 11 Tex. Civ. App., 327, 32 S. W., 452 (Writ Ref.); State v. Haldeman, 163 S. W., 1020 (Writ Ref.); State v. Wilson, 71 Texas, 291, 9 S. W., 155.

2   All public offices and officers are creatures of law. The

powers and duties of public officers are defined and limited by law. By being defined and limited by law, we mean the act of a public officer must be expressly authorized by law, or implied therefrom. 22 R. C. L., p. 555, §114. It follows from the above that public officers may make only such contracts for the government they represent as they are authorized by law to make.

3 From the statement we have made it appears that this lease contract was made by the Adjutant General on behalf of the State to run for a period of five years from September 1, 1931. The appropriation here involved was to pay the contract rentals under such contract. The Attorney General contends that the Adjutant General was without power to make a lease contract for a period of five years, and, therefore the contract was, and is, illegal. In this connection, the Attorney General contends that there was no law, express or implied, in force at the time this contract was entered into to authorize its making. We are compelled to sustain this contention.

The office of Adjutant General is a creature of law. The duties and powers of the person holding such office are also defined by law. We have carefully examined our civil statutes relating to the powers and duties of the Adjutant General, and so far as we have been able to find the following statutes, together with the provisions of the appropriation bill already quoted, are pertinent here:

Art. 5787. "The Adjutant General shall be the head of the Adjutant General's Department, and shall have the rank of brigadier general. He shall be biennially appointed for a term of two years by the Governor, by and with the advice and consent of the Senate, if in session."

Art. 5788. "The person appointed Adjutant General shall first enter into a bond with two or more good and sufficient sureties payable to and to be approved by the Governor, which bond shall be in the sum of ten thousand dollars, conditioned for the faithful performance of the duties of said office."

Art. 5790. "The Adjutant General shall be in control of the military department of this State and subordinate only to the Governor in matters pertaining to said department, or the military forces of this State; and he shall perform such duties as the Governor may from time to time entrust to him, relative to the military commission, the military forces, the military stores and supplies, or to other matters respecting military affairs of this State; and he shall conduct the business of the department in such a manner as the Governor shall direct. He shall have the custody and charge of all books, records, papers,

furniture, fixtures and other property relating to his department; and shall perform as near as practicable, such duties as pertain to the chief of staff, the military secretary and other chiefs of staff departments, under the regulations and customs of the United States Army."

Art. 5791. "The Adjutant General shall, from time to time, define and prescribe the kind and amount of supplies to be purchased for the military forces of this State, and the duties and powers respecting such purchases; and shall prescribe general regulations for the transportation of the articles of supply from the places of purchase to the several camps, stations of companies, or other necessary places for the safe-keeping of such articles, and for the distribution of an adequate and timely supply of the same to the regimental quartermasters, and to such other officers as may, by virtue of such regulations, be entrusted with the same; and shall fix and make reasonable allowance for the store rent and storage necessary for the safe-keeping of all military stores and supplies; and shall control and supervise the transportation of troops, munitions of war, equipment, military property and stores throughout the State."

Art. 5792. "The Adjutant General may prescribe rules and regulations to be observed in the preparation and submission and opening of bids for contracts under his department; and at his discretion may require any bid to be accompanied by a good bond in such penal sum as he deems advisable, conditioned that the bidder will enter into a contract agreeable to the terms of his bid, if the same be awarded to him, within sixty days from the date of the opening of the bids, or otherwise pay the penalty. No bid shall be withdrawn by the bidder within said period of sixty days."

Art. 5793. "The Adjutant General shall prescribe regulations not inconsistent with law for the government of his department and the custody, use and preservation of the records and property appertaining to it whether belonging to this or the United States, such regulations to be operative and in force when promulgated in the form of general orders, circulars or letters of instruction and shall:

"1. Superintend the preparation of such returns and reports as may be required by the laws of the United States from this State.

"2. Keep a register of all officers of the militia of Texas, and keep in his office all records and papers required to be kept and filed therein.

"3. Have printed at the expense of the State, when neces-

sary, the military law and regulations of Texas, and distributed to the commissioned officers, sheriffs, clerks and assessors of the counties of Texas at the rate of one copy to each.

"4. Issue to each commissioned officer and headquarters one copy of the necessary text books, and of such annual reports concerning the militia as the Governor may elect.

"5. Cause to be prepared and issued all necessary blank books, blanks, forms and notices required to carry into full effect the provisions of this law."

Art. 5794. "He shall report annually to the Governor the following information to be laid before the Legislature:

"1. A statement of all moneys received or disbursed by him since his last annual report.

"2. An account of all arms, ammunition, and other military property belonging to this State, or in possession of this State, from what source received, to whom issued, and its present condition, so far as he may be informed.

"3. The number, condition and organization of the Texas National Guard and reserve militia.

"4. Any suggestions which he may deem of importance to the military interest and conditions of this State, and the perfection of its military organization."

Art. 5798. "The Adjutant General, after the appropriations are made for that purpose, may purchase and keep ready for use, or issue to the military forces of this State, as the best interests of the service may require, such amount and kind of quartermasters, ordinance, subsistence, medical, signal, engineers, and all other military stores and supplies as shall be necessary; he shall see that all military stores and supplies both the property of this State and of the United States are properly cared for and kept in good order, ready for use; and all accounts which may accrue against this State under the provisions of this chapter shall, if correct, be certified and approved by the Adjutant General and paid out of the State Treasury as other claims are paid. Any military stores belonging to this State which may become unserviceable, obsolete, or unfit for further use, may be disposed of in such manner as the Governor or Adjutant General may prescribe by regulations or order; and the Adjutant General may sell or destroy as he may see fit for the best interests of the service, any unserviceable, or obsolete, or unsuitable military stores belonging to this State, the sums realized from the sale thereof to be turned into the State Treasury, or he may in his discretion, exchange such stores for such other military stores as the interest of the serv-

ice may require, for the use of the active militia of this State."

A careful reading of the above quoted statutes clearly demonstrates that none of them contains any express language authorizing the Adjutant General to rent or lease armories for the National Guard for a period of five years, or for that matter, for any period. When we come to construe such statutes, together with the above-quoted appropriation act, it is reasonably clear to us that the Adjutant General had the implied power, within the reasonable limitations of such appropriation, to make contracts for the period and purposes covered thereby, and no further. This holding renders this contract illegal.

Since the Adjutant General had no authority to make the contract in the beginning his efforts to bind the State by the instruments, "issued in lieu of deficiency warrants" were ineffective for any purpose. Furthermore, the fact that such instruments were approved by the Governor can give relator no comfort. The Governor had no more power to ratify this contract than the Adjutant General had to make it. Furthermore, the Governor had already exhausted his power to grant deficiency warrants. In this connection the instruments show on their face that they were "issued in lieu of deficiency warrants" for presentation to the Claims Committee of the 43rd Legislature.

Relator advances the proposition that the opinion of the Supreme Court, speaking through Judge Pierson, in the case of Charles Scribner's Sons v. Marrs, 114 Texas, 11, 262 S. W., 722, is authority to hold that the Adjutant General had the power to make this contract for five years. We think the opinion in that case makes no such ruling. In the Marrs case the Supreme Court had under consideration a five year contract, but the contract was one expressly authorized by statute. No such case is presented here.

4 The fact that the contract contains a clause that authorizes either party to terminate it on sixty days notice to the other party does not relieve it of being a five year contract. In this connection it is held that a contract may provide for its termination at the option of one or either of the parties, but such a provision has no effect on the binding obligations of the contract so long as the parties act thereunder before revoking or terminating it. Maddox Motor Co. v. Ford Motor Co. (Com. App. opinion approved), 23 S. W. (2d) 333; 13 C. J., p 606.

From what we have said it is evident that we hold that the original five year contract was null and void. This being true

the State has always occupied the premises as a tenant at will. Rents for the first six months were paid out of the available appropriation. We are not here concerned with them. At the end of this period the appropriation was exhausted and the Adjutant General about that time informed relator thereof. He also informed relator that his department had been placed on a deficiency; that the power of the Governor to approve deficiencies had been exhausted, and that no further deficiencies could legally be allowed. The Adjutant General then fully informed relator that it would have to look to the 43rd Legislature to pay the rentals for the balance of the fiscal year 1932. In connection with such information the Adjutant General delivered to relator from month to month, the certificates, or due bills, shown above, signed by himself, and approved by the Governor. Clearly the above record will not support a ruling that, at the time this appropriation was made, relator had a legal claim against the State.

If the relator did not have a legal claim against the State at the time this appropriation was made the legislature had no power to make it. Section 44, article 3, Texas Constitution. Austin National Bank v. Sheppard, Comptroller, and Lockhart, Treasurer, supra.

In the Austin National Bank case, supra, we have fully discussed and construed Section 44 of Article 3 of our State Constitution. We here refer to that opinion and make it a part of this opinion so far as applicable.

If relator had any valid claim against the State at the time this appropriation was made such claim grew out of the original contract, or the due bills and letters of information already described, or all such instruments. Section 49 of Article 3 of our Constitution provides:

"No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or pay existing debt; and the debt created to supply deficiencies in the revenue shall never exceed in the aggregate at any one time two hundred thousand dollars."

5 It will be noted that the constitutional provision just quoted prohibits the creation of any debt against the State, with certain exceptions stated in the provision. Therefore, in order to hold that the transactions had between the Adjutant General and Governor on one side, and the relator on the other created a valid debt against the State, we must not only hold that the Adjutant General had authority in the premises but must fur-

ther hold that the debt created came within some of the exceptions contained in the constitutional provision just mentioned. Obviously this cannot be done. The Governor had already allowed the full deficiency provided by the Constitution, and this claim is in addition thereto. Furthermore the letter and certificates expressly show that they were issued in lieu of deficiency warrants.

Article 4351, R. C. S., 1925, provides:

"All heads of departments, managers of State institutions or other persons intrusted with the power or duty of contracting for supplies, or in any manner pledging the credit of the State for any deficiency that may arise under their management or control, shall, at least thirty days before such deficiency shall occur, make out a sworn estimate of the amount necessary to cover such deficiency until the meeting of the next Legislature. Such estimate shall be immediately filed with the Governor, who shall thereupon carefully examine the same and approve or disapprove the same in whole or in part. When such deficiency claim, or any part thereof, has been so approved by the Governor he shall indorse his approval thereon, designating the amount and items thereof approved and the items disapproved, and file same with the Comptroller; and the same shall be authority for the Comptroller to draw his deficiency warrant for so much thereof as may be approved; but no claim, or any part thereof, shall be allowed or warrants drawn therefor by the Comptroller, or paid by the Treasurer, unless such estimate has been so approved and filed * * *."

Article 4351a, R. C. S., 1925, as amended by ch. 158, p. 232, Acts 40th Legislature (Art. 4351a, Vernon's 1933 Sup.) reads as follows:

Art. 4351a. "It shall be lawful for the Governor to approve deficiency warrants as provided for in Article 4351, Revised Civil Statutes, 1925, to any amount, the aggregate of which does not exceed Two Hundred Thousand ($200,000.00) Dollars, for all purposes for which he is permitted to approve such deficiency warrants. If any deficiency warrants are approved above this amount, such warrants are invalid and unredeemable by the State Treasurer."

As already stated, the Governor had already exhausted his constitutional and statutory power to grant deficiencies. The record also shows that the arrangement between the Adjutant General and relator was not that relator should receive deficiency warrants out of the deficiency allowance above mentioned, but that instead he should receive certificates or due bills issued

"in lieu of deficiency warrants" to be presented to the 43rd Legislature. Such a transaction was an attempt to create a debt against the State in an unauthorized manner, and in our opinion amounted in law to an attempt to evade the plain constitutional and statutory provisions above quoted. Of course we do not intend to hold that any intentional violation of law was committed. We do hold however that these acts were in violation of both constitutional and statutory law.

6 As already pointed out, the original contract for the lease of this property was and is void for want of power or jurisdiction in the Adjutant General to make. Also as already pointed out, since the State never occupied the premises under a valid contract, it, at all times was a mere tenant at will. Granting, for the purposes of this opinion, that so long as there existed a lawful appropriation available to pay these rents, the Adjutant General had the right to expend it thereon as a tenant at will, still when the appropriation was exhausted the authority for the tenancy ceased to exist. Furthermore, in this instance, not only had the appropriation been exhausted, but the constitutional and statutory power to grant deficiencies had also been exhausted. Certainly under such a record the Adjutant General could not create a debt against the State in the manner here attempted. In other words, if the Legislature had made this appropriation conditional on the relator first securing a judgment against the State in a court of competent jurisdiction, and had granted the right to sue the State, the facts of this record could not form the basis of such a judgment. In this connection it is the settled law that the fact that the State occupied the premises is insufficient to show a ratification of the unauthorized contract. Nichols v. State, 11 Texas Civ App., 327, 32 S. W., 452 (writ ref.); State v. Haldeman (Civ. App., writ ref.), 163 S. W., 1020. Any other conclusion would result in a holding that would permit state officers to bind the State for future debts in any amount.

In the Nichols case, supra, suit was brought on an alleged contract between Nichols and the State. It appears that the legislature passed an Act appointing commissioners to contract for the erection of what is now known as the old General Land Office Building at a cost not to exceed $40,000.00, and an appropriation for that amount was made. The commissioners let the original contract to Nichols for a sum slightly less than the amount appropriated. After the contract was made, and after the contractor had progressed to some extent in the erection of the building, the commissioners and Nichols entered into a

further contract for certain additions and enlargements thereto, which increased the cost about $12,000.00 over the original contract. The commissioners promised Nichols that the State would pay this sum, and that they would recommend its payment to a subsequent legislature. The State received the building when completed and moved into and occupied the same. Nichols received the amount covered by the original contract and the claim for the additional contract was presented to a subsequent legislature. The legislature did not make any appropriation to pay the claim but passed an act permitting the State to be sued thereon to the extent of $7,000.00. Suit was filed in the District Court of Travis County, where judgment was rendered against the State for $337.00, the difference between the original appropriation of $40,000.00, and the original contract of $39,663.00. Nichols was denied any further recovery against the State for the claim based on the additional contract. On appeal to the Court of Civil Appeals at Austin that court, speaking through Judge Fisher, held that the subsequent contract for additions and enlargements created no legal obligation against the State because the Commissioners had no power to make it. The court further held that the fact that the State furnished and occupied the building was insufficient to show a ratification of an unauthorized contract. The court further held that the fact that the State permitted itself to be sued did not show a ratification of an unauthorized contract. We quote the following from this opinion:

"* * * But we are of opinion that the claim of appellant is not based upon any pre-existing law, and that such claim falls within the spirit and meaning of the prohibition contained in the latter part of the section of the constitution quoted. The apparent purpose of this provision of the constitution was to relieve the state from liability for all claims that were not authorized by a pre-existing law, and to prohibit the legislature from paying them. State v. Wilson, 71 Texas, 291, 9 S. W., 155. The law that authorized the commissioners to make a contract binding upon the state for the erection of the land office building, in express terms, declared that the cost of the building and furnishing it should in no case exceed the sum of $40,000. This was an express limitation upon the authority of the agents representing the state; and their efforts in this direction in attempting to impose upon the state a contract that increased its liability beyond the amount stipulated was clearly unauthorized, and an act not binding on the government. Mechem, Pub. Off., Secs. 828-834. Ferguson v. Halsell, 47

Texas, 422; City of Bryan v. Page, 51 Texas, 534; Curtis v. U. S., 2 Ct. Cl., 144; Reichard v. Warren Co., 31 Iowa, 387; 19 Am. & Eng. Enc. Law, 510, and notes. The claim of appellant to the extent of about $12,000 that grew out of the additional contract for the extra service was in excess of the amount provided by law for the construction of the building; hence there was an absence of a pre-existing law upon which to base this claim."

The case of State v. Haldeman, supra, is very similar to the Nichols case. In the Haldeman case the legislature appropriated $10,000.00 for the construction of one building and $37,500.00 for the construction of another building. The contracts to erect these buildings were let to one John F. Hart. By reason of changes made in the plans and specifications after the original contract was let the contractor, at his own expense, furnished material and labor amounting to the aggregate sum of $13,393.44, not included in the original contract. Claim for this amount was presented to the legislature. The 31st Legislature passed an act making an appropriation of $11,000.00 to pay the claim but provided that the claim should first be established by suit against the State. The act gave permission to sue the State on the claim. The Court of Civil Appeals held that the officers of the State were limited in contracting for the construction of these buildings to the amount appropriated by the legislature and that the contract above such appropriation was invalid and not a valid claim against the State.

In the case at bar the Adjutant General was limited in his right to contract to the amount of his appropriation bill. He was also limited by the term of such appropriation. When he attempted to go beyond the powers conferred upon him by law he acted without authority of law and, such act was and is void and does not bind the State.

Finally relator seems to advance the proposition that even if this contract, and the other transactions here involved were illegal in their inception the legislature had the power to authorize them in the beginning, and therefore had the power to ratify them. The proposition is then advanced that the legislature has ratified this contract and the other transactions connected therewith. We have already held that the mere fact that the State occupied the premises did not constitute a ratification. We do not consider it necessary to pass on the power of the legislature to have authorized this contract and the other matters connected therewith in the beginning; neither do we find it necessary to pass on the power to ratify. It is suffi-

cient to say that the act was not authorized in the beginning and the only act of ratification on the part of the legislature is the appropriation here under consideration. The legislature had no power to make such appropriation unless at the very time it was made there existed some "pre-existing law" authorizing the same. It is obvious that no such law then existed. Sec. 44, Art. 3, Texas Constitution; Austin National Bank v. Sheppard, Comptroller, and Lockhart, Treasurer, supra; Nichols v. State, supra; State v. Haldeman, supra.

The mandamus here prayed for is refused.

Opinion delivered May 29, 1935.

Chief Justice Cureton dissents.