ROSALIE BUTLER v. ROLLAND F. HATFIELD.

152 N. W. (2d) 484.

July 28, 1967—No. 40,949.

*Douglas M. Head,* Attorney General, and *James T. Halverson,* Special Assistant Attorney General, for appellant.

*James P. Miley* and *Israel E. Krawetz,* for respondent.

SHERAN, JUSTICE.

Appeal by the commissioner of administration of the State of Minnesota from an order of the district court granting a preliminary injunction.

The significant issue raised by the appeal is whether an agreement involving architectural services performed and to be performed for the State of Minnesota by the Walter Butler Company is void for illegality.

### THE FACTS

The factual and procedural background from which the issue emerges is this:

By L. 1965, c. 882, approved on May 26 of that year, there were appropriated sums of money as specified in the act for the purposes therein stated, including (§ 4, subd. 6) an appropriation to the commissioner of administration of approximately $4,000,000 in state funds for the purpose of constructing and equipping a library and instructional aids center, a science and technology center, a lecture center, a fine arts center, and a physical activities building, including utilities construction and site work, at Southwestern State College at Marshall, Minnesota.

On September 21, 1965, the State of Minnesota, acting through its commissioner of administration, entered into a contract, No. E-9507, with the Walter Butler Company for architectural services to be performed in connection with the construction at Southwestern State Col-

lege. By the terms of this agreement (which recites that the state "deems it in the public interest to let the architectural and engineering studies and work relating to the new Southwestern State College at Marshall, Minnesota to a single architectural firm") Butler was to be paid 5¾ percent of the construction cost of the project in exchange for the architectural services specified in the contract.

As of October 1966, the work contemplated by the September 21, 1965, agreement had been substantially completed. It was then anticipated that the Legislature of the State of Minnesota at its 1967 session would consider recommendations to be made by the Department of Administration for additional construction at Southwestern State College and other places, the cost of which would be defrayed in part by Federal funds. In preparation, Mr. Ray Lappegaard, acting as commissioner of administration for the state, entered into an agreement termed "Supplement to Contract No. E-9507" providing in part as follows:

"The 1965 Legislature authorized funds in the amount of not more than Five Million Dollars ($5,000,000.00), with State funds of Four Million Two Hundred and Seventy Six Thousand Two Hundred and Fifty Dollars ($4,276,250.00) for construction, equipment, contingency, utilities, site work, architectural fees, tests and surveys for a series of educational buildings. This series of educational building has been known as the First Phase of Southwest State College.

\* \* \* \* \*

*"Upon the knowledge and with full understanding that the funds necessary to initiate and complete Phase II have not been appropriated by the Legislature and that no such funds are presently available for the project, it has been mutually agreed between the State and the Consulting Architect that in consideration for* the preparation of preliminary plans and documents by the Consulting Architect as may be required for submittal of Federal application, the State hereby agrees to engage said Consultant to do the architectural and engineering work for Phase II *when and if the funds are authorized by the Legislature.*

"Having already been commissioned to prepare the architectural and engineering work on Phase I, the aforesaid assurance that he will be engaged on Phase II shall constitute consideration for additional work in-

curred in preparing the required preliminary plans and documents, *at such time as the funds are in fact appropriated by the Legislature for Phase II, payment in full for this work shall be forthcoming."* (Italics supplied.)

To us it is clear that the reference in this agreement to the "First Phase" of construction at Southwestern State College means the construction at that location authorized by the 1965 session of the legislature. Reference to "Phase II" of the project means the construction, if any, at that location which it was then thought that the 1967 session of the legislature would or might authorize by suitable appropriation. It is clear also that both parties understood that as of October 1966 there were no appropriated funds available to be used to hire Butler to do the work contemplated under the supplementary agreement and that both parties understood that Butler would be paid out of the appropriation for Phase II of the project at Southwestern State College *when and if* that appropriation was passed by the 1967 session of the legislature.

It is also clear that the supplement constituted a proposal by the commissioner of administration that Butler would be employed to do the architectural work on only such construction at Southwestern State College as the 1967 session of the legislature might authorize. In exchange, the architectural firm was to do the preliminary or schematic plans needed for presentation to the legislature at its 1967 session to be used as a basis for its decision as to whether any additional construction at Southwestern State College was to be authorized.

The supplement to Contract No. E-9507 does not purport by its terms to rely for validity on any funds in the general revenue fund of the state treasury nor does it purport to rely on any appropriated funds other than appropriations for Phase II of the project at Southwestern State College when and if this appropriation be passed by the 1967 session of the legislature.

Following the execution of the supplemental agreement, Butler proceeded to prepare the preliminary plans and documents contemplated. It submitted statements for the services rendered to the office of the state architect from time to time. These statements were not paid.

In early March of 1967, the matter came to the attention of Mr. Rolland

Hatfield who by then had succeeded Mr. Lappegaard as commissioner of administration for the State of Minnesota. He requested the attorney general for an opinion as to his rights and obligations in the premises. The attorney general's office recommended that the commissioner of administration send out notices to all architects including Butler with whom supplemental agreements of the type in question were entered in the fall of 1966 informing them that the State of Minnesota did not consider itself bound thereby.

On March 7, 1967, a notice was sent to Butler reading as follows:

"PLEASE TAKE NOTICE that the State of Minnesota is not bound by the Supplement to Contract No. E-9507 for additional work on State Project No. 3946; Southwestern State College, Marshall, Minnesota, consisting of preparation of preliminary plans and documents or any other work pursuant to said purported Supplement. Your company is hereby instructed not to perform any such work.

STATE OF MINNESOTA

By: *Rolland F. Hatfield*

Rolland F. Hatfield

Commissioner of Administration"

The value of the architectural services rendered by Butler in reliance upon the October 1966 agreement prior to March 7, 1967, was approximately $50,000, according to its records.

On May 3, 1967, action was instituted by Rosalie Butler on behalf of herself individually, and on behalf of other taxpayers similarly situated, against Hatfield seeking a judgment declaring the agreement between Butler and the State of Minnesota to be valid and enjoining the state from acting inconsistently with it. She also applied for a preliminary injunction to restrain the state from engaging another architectural firm to perform the services involved before determination of the principal action on its merits.

On May 29, 1967, Ex. Sess. L. 1967, c. 8, became effective. It provides in part:

"Section 1. * * * [T]here is hereby appropriated * * * the sums of money herein set forth or so much thereof as may be necessary.

* * * * *

"Sec. 5. To the commissioner of administration to construct and equip certain state college buildings ($)11,813,087

* * * * *

"(5) At Southwest State College

"(a) Construct and equip science and technology center    2,119,000
"(b) Construct and equip lecture center    1,354,000
"(c) Expand and equip physical activities facilities    780,000
"(d) Construct and equip a maintenance building    237,000
"(e) Construct and equip a library and instructional aids center    1,396,000
"(f) Site development    120,000"

It is to be noted that except for item 5(d) above, the buildings involved bear the same description as those involved in the appropriation for buildings at Southwestern State College made by the 1965 session of the legislature of this state.

On June 8, 1967, the trial court issued its order granting respondent's motion for a preliminary injunction.

The state now appeals, contending that this order was erroneous as a matter of law because the agreement in question was invalid on its face and because, in addition, the plaintiff had failed to establish the necessity for a restraining order pending the ultimate disposition of the case. Upon application by the state, we ordered an expedited hearing of this appeal before this court on July 17, 1967, upon the ground that the public interest required an early decision of the legal issue involved.

### THE DECISION

In an effort to analyze the problems raised by the state's claim that the supplemental contract or agreement was invalid on its face, we look for answers to these questions:

(1) To what extent is the State of Minnesota, acting through appropriate departments and agencies of government, empowered to enter into contracts contemplating the performance of professional services to be paid from public funds?

(2) Of this power, what part has been properly delegated for per-

formance to the commissioner of administration of the State of Minnesota?

(3) To what extent is the power so delegated to the commissioner of administration of the State of Minnesota restricted by the provisions of our constitution or statutory limitations involving fiscal controls?

(4) To what extent, if any, is the power of a commissioner of administration in this area affected by the expiration of his term of office before an agreement made by him is fully executed?

(5) If the commissioner of administration of the State of Minnesota has authority to enter into an agreement for the performance of architectural services with the obligation of the state to pay for such services contingent upon the enactment of an appropriation by the next succeeding legislature of the state, can the rights of the architect who performed services in reliance upon the agreement and in the hope that the contingency would come about be extinguished by the declaration of a successor to the office of the commissioner of administration that the agreement of his predecessor was illegal and of no binding effect?

■ Except as limited by the provisions of its own or the Federal Constitution, a state has absolute and unqualified power to enter into contracts which advance its proprietary interests. State ex rel. Equity Farms, Inc. v. Hubbard, 203 Minn. 111, 280 N. W. 9; 81 C. J. S., States, § 112; 49 Am. Jur., States, Territories, and Dependencies, § 62; 17 Dunnell, Dig. (3 ed.) § 8828.

■ In Minnesota administrative responsibility for the construction and maintenance of public buildings has been placed by Minn. St. 16.01 in a commissioner of administration appointed by the governor by and with the advice and consent of the senate and removable by the governor during his term only for cause. Section 16.02, which defines the powers and duties of the commissioner of administration, empowers him, among other things:

"Subd. 4. To supervise and control the making of all contracts for building * * * and other improvements * * *.

"Subd. 5. To cause to be prepared plans and specifications for the construction, alteration, or enlargement of all state buildings, structures,

and other improvements * * *; to approve such plans and specifications; to advertise for bids and award all contracts in connection with such improvements; to supervise and inspect all work relating thereto; after any contract for such an improvement is let, to approve all lawful changes in plans and specifications; to approve estimates for payment; and to accept such improvements when completed according to such plans and specifications.

\* \* \* \* \*

"Subd. 9. To supervise and control the making of necessary repairs to all state buildings and structures, except structures, other than buildings, under the control of the state highway department."

Minn. St. 16.24 provides:

"The commissioner shall have the power to supervise * * * the making of all contracts and the creation or incurrence of all financial or contractual obligations; * * * the construction and erection of all buildings and structures by or for the state or any such department, agency, or institution * * *."

By decision law we have recognized that the services to be performed by architects and engineers in furnishing preliminary sketches, plans, and specifications and affording superintendence during construction are of a unique character. See, Krohnberg v. Pass, 187 Minn. 73, 244 N. W. 329. See, also, Annotation, 142 A. L. R. 542.

Minn. St. 16.32 provides:

"Subdivision 1. The commissioner of administration shall prepare plans for all improvements or buildings costing more than $1,000, for which he may recommend an appropriation. These plans shall be paid for out of any money in the state treasury, not otherwise appropriated, but when an appropriation has been made for the purpose of constructing such building, the fund from which payment for plans was made shall be reimbursed from such appropriation, and no part of the balance shall be expended until the commissioner has secured suitable plans and specifications, prepared by a competent architect, and accompanied by a detailed statement of the amount, quality, and description of all material and labor required for the completion of the work; and no plan shall

be adopted, and no improvement made or building constructed, that contemplates the expenditure for its completion of more money than the appropriation therefor, unless otherwise provided in the act making the appropriation. In no event shall the commissioner direct or permit any expenditure beyond that appropriated or contemplated by law, and any agent of the commissioner violating this provision shall be guilty of a gross misdemeanor.

"Subd. 2. Notwithstanding any provision in this section to the contrary, the commissioner may after consultation with the legislative building commission, adopt a plan, provide for an improvement, or construct a building that contemplates expenditure for its completion of more money than the appropriation therefor, if the excess money is provided by the United States government and granted to the state of Minnesota under federal law or any rule or regulation promulgated thereunder. Such federal money, for the purpose of this section, shall be deemed a part of the appropriation for the project."

■ However, the powers of the commissioner of administration in entering into agreements with respect to the construction of buildings for the state are subject to certain express and implied limitations stemming from the provisions of our state constitution and applicable general laws. Minn. Const. art. 9, § 9, provides:

"No money shall ever be paid out of the treasury of this State except in pursuance of an appropriation by law."

Minn. Const. art. 4, § 12, provides in part:

"No money shall be appropriated except by bill."

A statute creating a liability on the part of the state is not an "appropriation by law" within the meaning of this constitutional provision. State ex rel. Chase v. Preus, 147 Minn. 125, 179 N. W. 725; County of Beltrami v. Marshall, 271 Minn. 115, 135 N. W. (2d) 749. Minn. St. 6.23 provides:

"Unless otherwise expressly provided by law, no money belonging to or for the uses of the state shall be expended or applied by any official, department, or agency of the state government or any institution under its control, except under authority of an appropriation by law and an

allotment relating thereto as herein provided and upon warrant of the auditor."

Section 10.17 provides:

"When there has been an appropriation for any purpose it shall be unlawful for any state board or official to incur indebtedness on behalf of the board, the official, or the state in excess of the appropriation made for such purpose. It is hereby made unlawful for any state board or official to incur any indebtedness in behalf of the board, the official, or the state of any nature until after an appropriation therefor has been made by the legislature. Any official violating these provisions shall be guilty of a misdemeanor and the governor is hereby authorized and empowered to remove any such official from office."

Section 16.10 provides in part:

"* * * [N]o purchase order or contract shall be valid or effective without the approval and signature of the commissioner and the counter-signature of the auditor, who shall certify that the appropriation and allotment have been encumbered for the full amount of the contract liability."

Section 16.16, subd. 8, provides in part:

"No payment shall be made and no obligation shall be incurred against any fund, allotment, or appropriation unless the state auditor shall first certify that there is a sufficient unencumbered balance in such fund, allotment, or appropriation to meet the same * * *."

■ In addition to these specific limitations appearing in our state constitution and in the statutes, there is an implicit restriction of the power of state officials arising out of the necessity that the policies of the state be responsive to the will of the people as expressed by duly elected officers and their appointees. A public official cannot anticipate his contracting powers for the purpose of unreasonably limiting the authority of a successor in office. See, 81 C. J. S., States, § 113; 15 Dunnell, Dig. (3 ed.) § 7998; Annotations, 70 A. L. R. 794 and 149 A. L. R. 336.

But contracts by public officials are not made invalid merely because the official's term expires before the contemplated performance of the

contracts. See, Norton v. Wilkes, 93 Minn. 411, 101 N. W. 619; Manley v. Scott, 108 Minn. 142, 121 N. W. 628; Ambrozich v. City of Eveleth, 200 Minn. 473, 274 N. W. 635, 112 A. L. R. 269.

The legislature may ratify an unauthorized contract entered into by one of the state officials on its behalf even though in excess of his authority. 17 Dunnell, Dig. (3 ed.) § 8828, and case cited under note 41.

■ Where services of a substantial value have been rendered in anticipation of compensation contingent upon action to be taken by the legislature at its next session, the successor in office of a public official who requested the performance of the services is not free to rescind the arrangement before the legislature has acted or refused to act if his only reason for doing so is an erroneous belief that the arrangement was illegal on its face.[1] If there were fraud or collusion involved in the arrangement, the result would be otherwise. The fact that the contingency involved is a legislative appropriation does not void the arrangement.[2] Notice 81 C. J. S., States, § 161. The situation would be different if the commissioner of administration lacked authority to make agreements involving the employment of architects.[3] If the legislature had refused to

---

[1] In Norton v. Wilkes, 93 Minn. 411, 101 N. W. 619, an agreement made by public officials to employ a school teacher for a period of 8 months was not invalid even though the obligation was contingent upon voter approval of an extended school term. Even though the obligation to perform of one party to an agreement is made dependent upon a future event, there may be an implied contract not to rescind the proposal prematurely. See, Restatement, Contracts, § 46; Annotation, 48 A. L. R. (2d) 1069; 1 Corbin, Contracts, § 51; 17A C. J. S., Contracts, § 338; 17 Am. Jur. (2d) Contracts, § 24; The Lake Co. v. Molan, 269 Minn. 490, 131 N. W. (2d) 734.

[2] Although not directly in point, the cases cited by respondent support this principle. Charles Scribner's Sons v. Marrs, 114 Tex. 11, 262 S. W. 722; Miller Ins. Agency v. Porter, 93 Mont. 567, 20 P. (2d) 643; State ex rel. Armontrout v. Smith, 353 Mo. 486, 182 S. W. (2d) 571; State ex rel. Averill v. Smith, 352 Mo. 23, 175 S. W. (2d) 831. State ex rel. Point Towing Co. v. McDonough, 150 W. Va. 724, 149 S. E. (2d) 302, and State ex rel. Brooks Equipment & Mfg. Co. v. Evatt, 137 Ohio St. 125, 28 N. E. (2d) 360, cited by appellant, do not persuade us to the contrary.

[3] See, Fort Worth Cavalry Club v. Sheppard, 125 Tex. 339, 83 S. W. (2d) 660.

make the anticipated appropriation, there would have been no contract.[4]

■ On the basis of these general principles, we affirm the decision of the trial court in so far as it is based on the theory that the agreement of October 1966 was not invalid on its face although, in our view, it imposed no financial obligation on the state until an appropriation for the buildings to be constructed at Southwestern State College was made by the 1967 session of the Minnesota Legislature.

The object of the contract—preparation for the construction of buildings for a state college—was a proper field for the exercise of state power. The duty of developing the plans and specifications needed by the legislature in deciding whether to appropriate funds for the buildings involved was one assigned specifically to the commissioner of administration by the terms of Minn. St. 16.32. The commissioner's power to enter contracts with architects for this purpose appears also in § 16.02, subd. 5, as does his power to employ architects for the additional professional assistance needed to assure acceptable performance of construction contracts with the state.

The authority of the commissioner of administration in this field is limited, of course, by our constitution. If the agreement here involved did in fact provide for payment of state funds to the architect "except in pursuance of an appropriation by law," it would have been invalid. But it did not. To the contrary, the agreement recognizes that no appropriation existed for the construction involved as of October 1966. By its terms, the state neither incurs indebtedness nor is to make payment for services unless and until an appropriation for the planned construction was made by the 1967 session of the state legislature. If no such appropriation had been made, the architect would have had no rights under the October 1966 agreement. His present rights under it exist only because at its recent session the legislature did in fact appropriate the funds from which payment will ultimately be made.

We cannot see at the present stage of the case that the October 1966

---

[4] See, Preston v. Clements, 313 Ky. 479, 232 S. W. (2d) 85; Peck v. City of New Orleans, 199 La. 76, 5 So. (2d) 508. See, also, Restatement, Contracts, § 257.

agreement was invalid because it contemplated performance which would occur after the term for which the commissioner of administration then in office had been appointed. We can take judicial notice of the fact that the term for which Commissioner Lappegaard was named was to have expired February 1, 1967. We know, also, that most of the services covered by the agreement were to be performed after that date. We can observe that the commissioner of administration is appointed by the governor, and that as of October 1966 the identity of the person who would hold that office from 1967 to 1971 would be in doubt for another month. Even so, we cannot say from inspecting the agreement that its only purpose—or even its predominant purpose—was to commit the State of Minnesota to the employment of a particular architect for work to be performed in the future in anticipation of a change of state administration.

The proposal embodied in the agreement appears to be a reasonable one when viewed from the standpoint of the state's interests. If an application for Federal funds to be used in connection with the construction was to be made in sufficient time to permit the work to proceed in the ordinary course of events, there was a need that a competent architect be employed to prepare the plans and specifications in support of the necessary Federal applications. If the 1967 session of the legislature was to be adequately advised as to the type and probable cost of the buildings recommended for Southwestern State College by the commissioner of administration, plans and specifications of a type particularly described in Minn. St. 16.32 were needed. It is reasonable to assume that the development of such plans and specifications must be initiated a sufficient time prior to the convening of the legislature to permit the work to be done in an accurate and skillful manner. It is reasonable also to assume that the logical firm to employ for such architectural services was one with previous experience at the building site. On the face of things, there appears no reason for employing one architectural firm to do the work necessary in the preparation of plans and specifications for the construction of a building and then to employ another architectural firm to duplicate the effort after appropriations for the buildings have been made. It seems reasonable, finally, to think that a responsible architectural firm would not be interested in preparing preliminary plans and specifications, for

which it would receive no compensation under its agreement if an appropriation was not made, if it was considered likely that the occurrence of the contingency upon which its compensation was to depend would terminate its further employment in connection with the project. If it is a common business practice to employ one firm of architects to prepare initial plans and specifications for major buildings and to employ a different firm of architects to complete the work, we are unaware of it.

It may be possible in situations such as the present one that a full development of the facts would show an agreement of this kind to be invalid upon the ground that it was entered by the state in furtherance of private rather than public interests. But in the present situation the state has offered no evidence in support of such a theory. It does not question the competency of the architectural firm with which this particular agreement was made. It does not attempt to show any defect in the performance of the architectural services by Butler either in connection with what has been termed Phase I of the project at Southwestern State College or with respect to the development of the preliminary plans and specifications which it undertook in reliance upon employment for the project should the appropriation be made. It makes no attempt to show that there is any other firm of architects which could be employed to perform the services involved in a more satisfactory manner, at a more reasonable cost, or with greater expedition of the state's interest in early completion of the building project. It makes no attempt to show or to assert that the interest of the State of Minnesota will be adversely affected in any specific way by the performance of the agreement made by the predecessor of the present commissioner of administration.

The state does point out that the effect of these October 1966 agreements was to limit the choice of the present commissioner of administration as to the architects to be employed on construction projects by the State of Minnesota. But this is true of any contract entered into during the term of a predecessor in office. It is necessary that this be so because in the business affairs of the state the obligations to be formed under contracts made in the furtherance of the state's business cannot generally be made coterminous with tenure. Where, as in this case, there appears a legitimate public purpose in making an agreement of the kind here in-

volved, we must presume the purpose of the agreement to have been a proper one unless and until specific evidence to the contrary is produced. There has been no such evidence produced in the present case and the trial court was correct in declining to assume its existence. See, Hart v. Bell, 222 Minn. 69, 23 N. W. (2d) 375, 24 N. W. (2d) 41; Investors Syndicate v. Baskerville Brothers Holding Co. 200 Minn. 461, 274 N. W. 627.

The March 7, 1967, notification to Butler that the state had no obligation under the October 1966 agreement must be disregarded for the present because it was based upon the incorrect assumption that the October 1966 agreement was invalid on its face. As of the time the notice was sent, Butler had no enforceable contract for architectural services with the State of Minnesota. What it did have was a proposal that it would receive enforceable rights for compensation in exchange for architectural services *if* the 1967 session of the legislature appropriated funds for specific buildings at the Southwestern State College at Marshall. The architectural firm having been induced to render professional services in reliance upon this proposal, the commissioner of administration was not in a position to rescind or annul the legitimate act of a predecessor done with motives presumably in furtherance of the public interests. The legislature could have made the agreement a nullity by refusing to appropriate funds for the buildings or by specifying in the appropriation act that no part of the funds appropriated should be applied in payment of the past or future architectural services of Butler. But this did not happen. The appropriation was passed. The use of it was not limited. The proposal made by Commissioner Lappegaard in October 1966 was ratified and given contractual validity.

■ The state has also urged that the temporary restraining order issued in this case was improper. It argues that the hardship to be suffered by the State of Minnesota if enjoined from employing a substitute architect on this particular project, should it ultimately be determined in the main action that the agreement is not an enforceable one, far outweighs that to be suffered by the taxpayers generally if the state proves to be wrong in its estimate of the case. The disadvantages from the state's point of view relate principally to the possible loss of Federal allotments

and the postponement of the educational opportunities which will be available when the building is once constructed. Part of the difficulty with this contention is that it runs both ways so far as our present problem is concerned. If it be true that time is so much of the essence as the state suggests, it would seem unfair to use the pressures of time to defeat the rights of one who rendered services upon a contingent expectation of securing a contract, thereby speeding up the processes by which Federal subsidies and state building appropriations are secured. Apart from this, and of more significance, the entire case of the state to this point is based on the theory that the October 1966 agreement is invalid on its face. We have decided that it is not. There is nothing in the present record to indicate any likelihood that the state will ultimately prevail on the merits. In such a situation, we feel justified in affirming the determination of the trial court that there is no overwhelming state interest justifying denial of the temporary injunction. We also accept the trial judge's tentative determination that the plaintiff in the present action is a proper party to initiate an action as a taxpayer even though her relationship to the architectural firm involved is a close one.

Our disposition of the case makes it unnecessary to decide whether the architect would have been entitled to claim rights under § 16.32 if the appropriating bill had not been passed at the 1967 legislative session. We think it prudent to note for future reference, however, that any construction of the language of that section which would authorize *payment* for services rendered to the state without a bill by which the legislature appropriated the necessary funds would be violative of Minn. Const. art. 9, § 9, and art. 4, § 12. The appellant's contention that agreements of this kind constitute an encroachment on the power of the legislature does not persuade us because no payment for the services could be made without a bill appropriating the necessary funds. The power of the legislature to grant or withhold or grant on condition or subject to limitation cannot be curtailed by the acts of any public officer. For like reason, the apprehension that a public official's authority can be undermined by a calculating predecessor who anticipates the future needs of the public and provides for them by binding contracts does not appear well founded. If it should develop upon the trial of this case that the

purposes of the arrangement were other than they now appear to have been, there is ample authority in the trial court to ascertain the relevant facts as disclosed by any evidence hereafter adduced and resolve the problem in such a way that the public interest will not suffer. Our decision is limited to the problem before us. We hold only that on the present state of the record, it appears that the arrangement was a valid and reasonable one made binding on the state when Ex. Sess. L. 1967, c. 8, was enacted.

Affirmed.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.