Bob BULLOCK, Secretary of State et al.,
Relators,

v.

Robert S. CALVERT, Comptroller of Public
Accounts, Respondent.

No. B–3245.

Supreme Court of Texas.

March 8, 1972.

Small, Herring, Craig & Werkenthin, C. C. Small, Jr., John F. Morehead, Austin, for relators.

Crawford Martin, Atty. Gen., Sam Mc-Daniel, Asst. Atty. Gen., Austin, for respondent.

REAVLEY, Justice.

This original mandamus action seeks to compel payment out of state funds of an expense of a party primary election. It is brought by Bob Bullock, as Secretary of State, and by Bill Williams as Chairman of the Harris County Democratic Executive Committee. Williams also sues individually, as a member of the Democratic Party, as a qualified voter, and as a candidate in the Democratic Party primary for office of county chairman of the party in Harris County.

■ The object of the suit is to command the State Comptroller to draw warrants for the payment out of the state treasury of two vouchers totaling $157.16 for the purpose of meeting certain necessary expenses of the primary elections to be held by the Democratic Party in Harris County in May and June of this year. Under Art. 5, § 3 of the Texas Constitution, Vernon's Ann.St., and Art. 1735, Vernon's Anno.Tex.Civ.Stat., jurisdiction of the case lies in this court. The Secretary of State seeks to uphold the validity of his vouchers and of a contract with Williams; Williams seeks payment of money for primary election expenses incurred by his committee pursuant to the contract with the Secretary of State promising payment out of state funds. The mandamus may issue if there is a clear legal duty on the part of the Comptroller to issue these warrants. Texas Nat. Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627 (1939).

The Texas Election Code, V.A.T.S. (Arts. 13.02, 13.45) provides that nomination of candidates must be made by primary election of any party whose nominee for governor received as many as 200,000 votes at the prior general election. The party whose nominee for governor received as much as 2% of the total vote, but less than 200,000 votes, may choose to nominate either by primary election or by convention. If its gubernatorial nominee received less than 2% of the total vote, a party must nominate by convention. At the 1970 general election the nominees for governor of the Democratic and Republican Parties each received more than 200,000 votes. Therefore, in 1972, candidates of these two parties must be nominated by primary elections.

The Election Code provides that the expenses of a party primary election shall be collected from the candidates for nomination. (Art. 13.08 et seq.) However, this statutory provision has been successfully attacked as violative of the United States Constitution. A three judge federal court on December 21, 1970 declared the Texas filing fee scheme unconstitutional and enjoined its enforcement. Carter v. Dies, 321 F.Supp. 1358 (N.D.Tex.). That judgment has been unanimously affirmed by the United States Supreme Court through its opinion delivered February 24, 1972 holding that the Texas primary election filing fee system contravenes the Equal Protection Clause of the Fourteenth Amendment. Bullock v. Carter, 404 U.S. 134, 92 S.Ct. 849, 30 L.Ed.2d 92. The Court did not reject reasonable filing fees, but held that the Texas statute (Art. 13.08 et seq.) "erected a system which utilizes the criterion of ability to pay as a condition to being on the ballot . . ."

This federal litigation and the holding of the three judge court was known to the Texas Legislature when it was in session in 1971. It enacted a "temporary law" to allow persons unable to pay a filing fee to have their names placed on the ballot in primary elections by submitting petitions signed by a certain number of qualified voters. H.B. 5, 62d Leg., 1st called sess. (1971), ch. 11, p. 3443. The temporary law was to be in force during 1972 in the event the judgment of the three judge federal court was still in effect on the first day of 1972. The contingency was met and the question of the constitutionality of the 1971

act was then brought before the same three judge court. The new statute was held unconstitutional and its enforcement enjoined in Johnston v. Luna, 338 F.Supp. 355 (N. D.Tex.) by judgment entered on January 20, 1972.

Faced with the approaching primary elections, and with filing deadlines and election procedures at hand, the Secretary of State, Honorable Bob Bullock, moved to meet the emergency; he has established orders, rules and regulations for the conduct of the primary elections and for the payment of expenses by the use of state funds. Acting as the "chief election officer" of the state (Election Code, Art. 1.03), he has determined that uniformity cannot be obtained in the holding and conducting of 1972 primary elections without the expenditure of state funds.

Relators presented voucher no. 324 to the Comptroller on February 25, 1972, seeking the issuance of a warrant in the amount of $7.81 for the payment of stationery to be used by the Harris County Democratic Committee. This voucher was returned by the Comptroller without approval for the reason that "there is no appropriation available for the payment of this type of expense."

Voucher no. 326 was presented to the Comptroller on February 29, 1972. It seeks the payment of $149.35 to the Harris County Democratic Executive Committee for printed material supplied under a contract between the Secretary of State and the committee. A copy of this contract is attached to the voucher. The contract is dated February 25, 1972 and by its terms the Secretary of State agrees to reimburse the committee for expenses incurred in conducting primary elections in Harris County and not paid by the committee from filing fees and donations received. The Comptroller requested the advice of the Attorney General, who replied to the effect that the voucher should be refused. Accordingly, the Comptroller advised the

Secretary of State that it would not be approved for payment.

On each of these vouchers it is certified that the supplies are purchased by or for the Harris County Democratic Executive Committee for use in conducting the Democratic primary election. Relator Williams attaches an affidavit to the petition for mandamus saying that "sufficient funds do not exist in Harris County for the conduct of the Democratic Primary Election in a uniform manner as required by the Texas Election Code."

The refusal of the Comptroller to approve these vouchers is based upon the opinion of the Attorney General (No. M–1068) dated February 12, 1972 in which the Secretary of State and Comptroller were advised that payments could not be made through the office of Secretary of State for expenses of primary elections. Three reasons were given for that holding: (1) The expense of a primary election is not a public purpose and the Constitution therefore forbids that use of state funds under any circumstances; (2) No existing law authorizes the Secretary of State to use state funds for this purpose; (3) There is no appropriation of state funds to meet primary election expenses. Relators contend to the contrary, as they must; the disposition of this cause rests upon the resolution of these questions.

## PUBLIC PURPOSE

Art. 8, § 3 of the Texas Constitution provides: "Taxes shall be levied and collected by general laws and for public purposes only." And under Art. 3, §§ 51 and 52 of the Constitution there may be no grant of public money for private individuals or associations. In 1916 this Court held that the cost of party primary elections was not a public purpose and could not be financed out of public funds. Waples v. Marrast, 108 Tex. 5, 184 S.W. 180; Beene v. Waples, 108 Tex. 140, 187 S.W. 191. This holding was based upon the

view that a political party was a purely private association and that its choice of political nominees was a procedure of its own which it was not the duty of the state to provide.

Whatever the circumstances of the party primaries in 1916 which may have justified their being regarded as purely private affairs, this cannot be said today. That contention is not advanced by the Attorney General or by any participant in this cause. It was argued to the United States Supreme Court in 1944 in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110. The contention was that the Democratic Party constituted only a private and voluntary association which was entitled to limit its membership to voters of the white race. The contention was rejected on the ground that the primaries had become a part of the machinery for choosing officials, a unitary portion of the electoral process directed by state law, and that the determination of participants in the primary election must be regarded as state action.

For 66 years the Texas Legislature has regarded the primary election process as the most democratic procedure by which major party candidates can be nominated. It is not unusual for the contest for office to be resolved in the party primary and, in effect, the decision to be made there as to whom the public officer shall be. The party primary is an important part of the political process, as is attested by the many provisions in the Texas Election Code regulating it, and as is assumed by the holding and opinion of the United States Supreme Court in Bullock v. Carter, *supra*.

If the court by the Waples opinions intended to limit the use of state funds to those functions of the state government itself whereby it directly performs an essential service for all members of the public, that limitation would be unreasonable and contrary to a number of the opinions of this court.

In Davis v. City of Lubbock, 160 Tex. 38, 326 S.W.2d 699 (1959), an urban renewal statute, under which property was purchased by condemnation and then resold to private individuals, was held to be constitutional because it was for the *benefit* of the public and designed to insure that slum conditions would not recur within a foreseeable time. This court said that the requirement under Art. 1, § 17 of the Constitution that property not be taken unless for a "public use" was a similar requirement to that of Art. 8, § 3 that public funds be expended only for "public purposes." See also: Coastal States Gas Producing Co. v. Pate, 158 Tex. 171, 309 S.W.2d 828 (1958); Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79 (1940); Davis v. City of Taylor, 123 Tex. 39, 67 S.W.2d 1033 (1934); Goodnight v. City of Wellington, 118 Tex. 207, 13 S.W.2d 353 (1929).

The holding in the Waples cases that the expenditure of public funds to finance party primary elections cannot meet the public purpose test, and that any such expenditure is necessarily proscribed by the Constitution, must be overruled. We hold that it lies within the discretion and power of the Legislature to appropriate state funds for this purpose.

## STATUTORY AUTHORIZATION

Having decided that the Legislature may provide for state financing of party primaries, the question then becomes whether it has done so.

The claims here presented to the Comptroller are valid only if the making of these contracts and expenditures are within some statutory authorization, and if they are payable out of a certain legislative appropriation.

■ The appropriation of state money is a legislative function. The Texas Constitution by Art. 8, § 6 provides that no money shall be drawn from the state trea-

sury unless pursuant to an appropriation "made by law."

The Secretary of State contends that these payments may be paid out of the appropriation for his office made by the General Appropriations Act, 62d Leg. (1971), ch. 1047, p. 3500 at item 8 which appropriates $565,611 for:

"Consumable supplies and the materials, current and recurring operating expenses (excluding travel expense), and capital outlay."

We will assume that if there is elsewhere in the statutes authority for the Secretary of State to provide materials and costs for party primary elections, he may draw upon this fund as an "operating expense" of his office. The appropriation is for the office of Secretary of State; we must now find the law that authorizes the Secretary of State to enter this contract with the Harris County Democratic Executive Committee and to pay the expenses of primary elections.

In Fort Worth Cavalry Club v. Sheppard, 125 Tex. 339, 83 S.W.2d 660 (1935) an attempt was made to collect rent on a building leased by the Adjutant General for a National Guard Armory. Payment was denied because the statute gave no authority to the Adjutant General to enter into the lease contract. The court said:

"All public offices and officers are creatures of law. The powers and duties of public officers are defined and limited by law. By being defined and limited by law, we mean the act of a public officer must be expressly authorized by law, or implied therefrom. 22 R.C.L. p. 555, § 114. It follows from the above that public officers may make only such contracts for the government they represent as they are authorized by law to make." 83 S.W.2d 663.

The question in State v. Ragland Clinic-Hospital, 138 Tex. 393, 159 S.W.2d 105 (1942) was whether an agent of the Texas Liquor Control Board had the authority to make a contract with the hospital to pay the medical expenses of his prisoner. The court found nothing in the statutes evidencing a legislative intent to authorize the making of such a contract and did not permit the collection of the hospital bill.

■ The Secretary of State rests his case entirely upon this paragraph from Art. 1.03 of the Election Code:

"The Secretary of State shall be the chief election officer of this state, and it shall be his responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws. In carrying out this responsibility, he shall cause to be prepared and distributed to each county judge, county tax assessor-collector, and county clerk, and to each county chairman of a political party which is required to hold primary elections, detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of electors and voting procedures which by law are under the direction and control of each such respective officer. Such directives and instructions shall include sample forms of ballots, papers, documents, records and other materials and supplies required by such election laws. He shall assist and advise all election officers of the state with regard to the application, operation and interpretation of the election laws."

He is designated "chief election officer" for the purpose of obtaining uniformity in the operation of the election laws. He is to assist and advise all election officers of the state. It is surely his office to communicate and explain the law to the end that all of the provisions of this Election Code will be followed throughout the state at every election and in every polling place. But no commission is given for him to conduct or to pay for party primaries.

It is argued that under all of the present circumstances, that commission must be implied. The statutes direct that these pri-

mary elections be held; they direct in great detail what must be done for the conduct of those elections. If the statutory directives are to be executed with uniformity throughout the state, money is required. The Secretary of State says that he is the one to solve the current problem and see that the elections are held; if public funds are required, his authority to use them must be implied.

We do not understand the express authorization of Art. 1.03 to be so broad as this argument assumes. The extent of that responsibility is with the election laws as they are written by the Legislature; it is not to write new laws—however they might promote uniformity.

█ It is quite true that every specific, permissible act of a public officer need not be expressed in a statute; we imply the authority to do those acts necessary to achieve the power or object expressly granted, because the Legislature must have intended to grant the constituent details within the larger commission. Terrell v. Sparks, 104 Tex. 191, 135 S.W. 519 (1911). It would be impossible, however, to imply in the legislative action here a grant of authority to the Secretary of State to finance party elections with state money. It has been the law of the state until today that the Constitution bars the way. The election laws of Texas have expressly provided since 1905 for this cost to be borne by candidates for party nomination. When the Legislature was last in session, it faced the problem that besets the election machinery today; but it only modified the previous scheme on a contingent and temporary basis and said nothing about the use of state funds for this purpose nor of the administration of finances by the Secretary of State.

While no specific commission to underwrite the election costs can be implied in the face of those contrary enactments, the Relators urge a much broader implication to ascribe to the statute. They would read into Article 1.03 a delegation of authority

to care for any breakdown in the election process. As for that whole process, the Legislature is said to have assigned the Secretary of State to deal with every hiatus and fill every void when the Legislature is not in session. For two reasons we disagree.

In the first place, we cannot find anything in the statute writing such a blank check to the Secretary of State. The particular statutory language quoted, which first made him the chief election officer, was enacted in 1967. S.B. 58, 60th Leg., ch. 723, p. 1858. The emergency clause (Sec. 79) of that act provided "that the orderly conduct of elections in this state is hampered by conflicts, ambiguities, and hiatuses in existing statutes, which are corrected by this Act . . ." The Legislature intended to correct the hiatuses; it did not intend to leave that assignment for the Secretary of State.

Secondly, the effect of this degree of implied authority would be to give the Secretary of State the decision on whether or not state funds should be used for party primary elections and, if so, for what particular expenses and to what extent. This would be an unconstitutional delegation of legislative power in violation of the separation of powers section (Art. 2, § 1) of the Constitution.

█ It is the position of the Relators that necessity requires the approval of their procedure, inasmuch as there is no other method by which the Democratic and Republican parties can nominate candidates for the general election and there is no other means of financing the primary elections. It may be true that these parties are unable to raise sufficient funds by their own devices. And it may well be that the only other alternative is an expensive special session of the Legislature, which could come as a burden upon its members, requiring them to meet a difficult problem in a brief and at an inopportune time. However, these are considerations which we cannot reach without assuming to ourselves

what the Texas Constitution does not allow us. That Constitution requires legislative authorization and appropriation for the expenditure of public funds. Since we can find no statutory provision empowering the Secretary of State to expend state money for the conduct of party primary elections, it becomes our constitutional duty to deny the petition for mandamus. It is so ordered. No motion for rehearing may be filed.