**STATE of Texas et al., Appellants,**

v.

**CITY NATIONAL BANK OF AUSTIN, Appellee.**

No. 1238.

Court of Civil Appeals of Texas, Tyler.

Feb. 8, 1979.

Rehearing Denied March 15, 1979.

156

Carla J. Cox, Asst. Atty. Gen., Austin, for appellants.

E. Richard Criss, Jr., Brown, Maroney, Rose, Baker & Barber, Austin, for appellee.

McKAY, Justice.

City National Bank of Austin (bank), appellee, brought suit against the State of Texas (State), the State Commission for the Blind (Commission), the Executive Director of the Commission and its individual members, to recover rent alleged to be due the bank for office space occupied by the Commission. The State answered by alleging that no valid contract existed during the period sued for, and, therefore, no sum of money can be paid under the Constitution of Texas; moreover, the State alleged, the Board of Control (Board) had refused to approve any voucher for rent until it had awarded a valid contract for premises for the use of the Commission. Trial was before a jury, and based upon the verdict, the trial court rendered judgment for the bank, against the State and the Commission for rent and interest totalling $179,674.46.

The bank alleged that it had a written contract with the Commission for lease space in its building in Austin at a rental of 50.9 cents per square foot for a period of 48 months (from September 1, 1971, through August 31, 1975); that the lease was subsequently amended to add additional space, and at the times pertinent here the Commission occupied 23,348 square feet of space in the bank's building. Prior to the end of the primary term of the lease, the bank alleged the Commission requested that it be allowed to hold over under the terms of their written lease with the bank until other suitable space required by the Commission could be obtained. The bank further alleged that it agreed to the Commission's proposal to hold over, but alleged it never consented or acquiesced to occupancy of its premises by the Commission without compensation, and continued to rely on representations that rental payments would be made as set out in the lease. It was further

alleged that during the period the Commission was holding over the Commission was not a party to any other valid contract or lease for space suitable for its use in carrying out its statutorily mandated functions, and that funds were appropriated by the Legislature and available to pay rent for the occupancy of leased premises by the Commission during the period in question. Alternatively, the bank alleged that the occupancy by the Commission under the circumstances constituted a taking of its property for public use, without its consent, in violation of the Constitutions of Texas and the United States.

The State alleged there was no valid contract during the period the Commission was holding over; that the Constitution of Texas, Article III, Section 44, prohibits payment of the claim; that the bank's pleading fails to allege sufficient facts to establish any taking of the bank's property; and that any occupancy of the premises was with the consent of the bank in that the bank did not give the Commission written notice to vacate the premises, did not file a forcible entry and detainer suit, did not lock the doors of the premises, nor take any further action to prevent the Commission from occupying the premises.

The jury in issue 1 answered that the reasonable monthly rental value of the premises in the bank building to the Commission from September 1, 1975, through October 14, 1976, was $.509 per square foot; by its answer to issue 2 the jury found "that the location of the premises at 105 Riverside Drive were not in conformity with the needs of the [Commission] for its use as its central office."

The Executive Director of the Commission, Burt L. Risley, testified that in February prior to the expiration of the Commission's lease at the bank in August, 1975, the needs of the Commission were made known to the Board of Control, and the Board advised that there were six parties interested in leasing space for the Commission; that each location was inspected for suitability and specific needs of the Commission, and there was considerable correspondence

with the Board concerning these locations and whether they would be functional and meet the needs of blind people in their jobs; that the Board selected a location at 105 West Riverside Drive in South Austin; that these premises were "absolutely not suitable" because of various and numerous problems with the building: its location; its architectural barriers; the heavy traffic on a thoroughfare street; the noise level which affects a blind person; the lack of curbs at the corner because of the location of a filling station (curbs are used by blind persons as markers for location and tracking); the building being located away from the street with a parking lot between the street and the building; the holes in the sidewalk in which a blind person's cane could get caught; there was no elevator in the two-story building; the stairway had metal, unenclosed steps; wheel-chair employees could not get to the second floor; and the difficulty of reaching the location by bus from either the Austin bus system or from the intercity bus station.

Risley further testified that all of these objections were made known to the Board and the Board was advised the building was unacceptable. He further said negotiations continued and a meeting was had with the Board but the Commission was precluded from presenting some of its evidence, and the Board refused to change its decision; that there were no other adequate facilities available; and that the Commission continued to occupy the premises in the bank until October 14, 1976, with the knowledge of the Commissioners and the Board. Risley further testified that in the event the bank "threw the Blind Commission out" then "it would have been catastrophic."

The witness Hardey Holt, Supervisor of Staff Services for the Commission, testified to the unsuitability of the premises on Riverside Drive, and his reasons why it could not be used were almost identical to those given by Risley.

John Spurlock, President of the bank, testified that he learned before the written lease expired that the bank was not the low bidder for premises for the Commission for

another lease period; that Risley told him the premises of the low bidder were unacceptable to the Commission and it would not be moving, and "not to be concerned about the monthly lease rentals, that they did have funds and they would get this worked out, . . . that he would get this worked out with the Board of Control and for us not to be concerned about it." Spurlock further testified that Mr. Sapp, Chairman of the Commission, visited with him in November, 1975, and reaffirmed that the proposed premises were not acceptable, and "to stay with them and that they would get this thing all worked out." He said Sapp "indicated that we would be paid."

Homer Forester, Executive Director of the Board of Control, related the procedure followed by the Board and State agencies in obtaining leased space, and he gave the sequence of events concerning the Commission and its occupancy of premises in the bank, refusing to move to the Riverside Drive location, and later moving to the Stokes Building. Forester testified that the procedure followed to obtain rental space was for the Board to ask for specifications from agencies needing space, then to advertise for bids, and to make an award, but not to sign the lease.

The lease with the bank was signed by an officer of the bank for the bank, and by Risley for "State Commission for the Blind," and was approved as to form by an Assistant Attorney General for the Attorney General of Texas. The lease itself provides the bank was lessor, and "State Commission for the Blind acting for and on behalf of the State of Texas, hereinafter known as Lessee."

■ The State contends in its first point of error that the trial court erred in rendering judgment against the State because the claim of the bank arose out of a transaction which had not been provided for by pre-existing law. The State relies upon Article III, Section 44 of the Constitution of Texas, and maintains that it forbids the payment of "any amount of money out of the Treasury of the State, to any individual, on a claim . . . when the same shall not

have been provided for by pre-existing law . . . .." The State cites *Austin National Bank v. Sheppard,* 123 Tex. 272, 71 S.W.2d 242 (Tex.Com.App.1934, opinion adopted), and argues that such opinion prohibits the State from appropriating or paying any funds under the facts of this case. Article III, Section 44, Constitution of Texas, provides in part: "The Legislature [shall not] grant, by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law . . . .." The court in *Austin National Bank v. Sheppard,* supra, in interpreting the above, said at p. 245:

"We interpret this to mean that the Legislature cannot appropriate state money to 'any individual' unless, at the very time the appropriation is made, there is already in force some valid law constituting the claim the appropriation is made to pay a legal and valid obligation of the state. By legal obligation is meant such an obligation as would form the basis of a judgment against the state in a court of competent jurisdiction in the event it should permit itself to be sued."

The principle, citing *Austin National Bank v. Sheppard,* supra, was reiterated by the Supreme Court in *Fort Worth Cavalry Club v. Sheppard,* 125 Tex. 339, 83 S.W.2d 660, 663 (1935).

Although *Austin National Bank v. Sheppard,* supra, was a suit for mandamus to compel the State Comptroller to pay the bank for a warrant it held which was issued to an out of state corporation by the Comptroller in response to an appropriation by the Legislature, it is helpful in reaching our conclusion here. The appropriation was to reimburse the corporation for fees paid to the Secretary of State under protest, and which fees were later determined to have been improperly collected because it was an illegal tax. There it was contended that the appropriation by the Legislature to refund fees illegally collected was a violation of Article III, Sec. 44 of the Constitution because such appropriation "shall not have

been provided for by pre-existing law." The court held that even though there was no pre-existing statutory law to authorize such appropriation Texas had adopted the common law where "it is not inconsistent with our Constitution and laws," and that "a common-law right is a right under a 'pre-existing law' within the meaning of the constitutional provision under discussion here."

The court there determined that the claim to a refund of an illegal fee collected by the state was "a legal obligation against the state at such time" because "A person who pays an illegal tax under duress has a legal claim for its repayment," and "the state is legally liable to repay this tax so illegally demanded and collected."

It should be noted that the question in *Austin National Bank v. Sheppard* was whether a mandamus should be granted to compel the Comptroller to refund an illegal tax or fee *after the appropriation had been made by the legislature,* whereas the question in the instant case is *whether the State is legally liable for the rental* to the bank for the months the Commission was holding over when there was a previous appropriation to pay for such rental. In our view the Constitutional provision does not apply to the factual situation in the instant case. The suit here is to determine the liability of the State for lease rental after the State has granted permission to be sued; it is not a question of the Constitutional authority of the Legislature to appropriate money when the appropriation has not "been provided for by pre-existing law."

If we be mistaken in our view that the Constitutional provision does not apply then it is our opinion that the decision in *Austin National Bank v. Sheppard,* supra, does not support the State's position. That decision interpreted Art. III, Sec. 44 of the Constitution as it applied to the mandamus suit and does not speak to the question presented here.

The State further claims that the procedure for executing a valid lease with a state agency is set out in Article 666b, Texas Revised Civil Statutes, and that under that statute (as amended in 1967) the sole authority for leasing space is in the Board of Control, and that this article is the "pre-existing law" that controls. We do not agree with this contention.

Article 666b (1967), supra, then provided that any state agency "when rental space is needed for carrying on the essential functions of such agencies," shall submit to the Board a request therefor, giving the specifications. The Board, "upon receipt of such request, and if the money has been made available to pay the rental thereon, and if, in the discretion of the Board such space is needed," shall advertise for bids for a period not to exceed four years; the bids shall be publicly opened, and the award made to the lowest and best bidder on such terms as agreed upon, which terms, with notice of award by the Board, shall be submitted to the Attorney General who will cause the contract to be prepared. It further provides: "*The parties to such contract will be the department or agency of the government using the space as lessee and the party renting the space as lessor.*"

Paragraph (15) of the lease provides in part: "In the event Lessee shall be in default in the payment of rentals . . . or shall otherwise breach its covenants or obligations . . . Lessor shall have the right and privilege of terminating this lease . . . and shall have the remedies now or hereafter provided by law for recovery of rent, repossession of the premises and damages occasioned by such default."

■ The Legislature authorized the Commission to contract for rental space and be the lessee. The written lease provides that the lessor shall have "the remedies . . . provided by law for recovery of rent." The Commission is an agency of the State, and the State is bound by its contract as a private citizen is bound by a like contract. *Board of Regents of University of Texas v. S & G Construction Co.,* 529 S.W.2d 90, 97 (Tex.Civ.App.—Austin 1975, writ ref'd n. r. e.); *Fort Worth National Bank v. State,* 158 S.W.2d 885, 887 (Tex.Civ.App.—Austin 1942, writ ref'd w. o. m.); *State v. Elliott,* 212 S.W. 695, 698 (Tex.Civ.App.—Galveston

1919, writ ref'd); 52 Tex.Jur.2d State of Texas, Sec. 48, p. 759.

■ Here the record reflects that the Commission had funds budgeted for its operation, including rental, for the period involved here. We assume that to mean there had been an appropriation of funds by the 64th Legislature which included funds for the Commission for this period. (Appropriations-General Act, chapter 743, S. 13, 52, provides for $266,670 for fiscal 1976, and $264,929 for fiscal 1977, for Central Administration for the Commission.) If that be true, which is not denied by the State, then there was pre-existing law providing for the payment of rent by the Commission. The dispute was between the Commission and the Board as to which premises the Commission would occupy. When the Commission refused to accept premises the Board selected the record is devoid of any action the Board took, if it could, to compel the Commission to move to the new location. Indeed, we are not cited any authority which compels a state agency to accept and occupy premises which it deems to be inadequate or unsuitable for its use. We are not enlightened as to the Board's authority, if any, to require occupancy of premises selected by the Board for a state agency. There are no rules or regulations, if any, of the Board in the record, nor any reference to such rules or regulations. Since the lease had expired, and the Commission had not moved, it was left to its own devices.

Had the Commission moved to the Riverside Drive location there seems to be no question that the State, through the Board and the Comptroller, would have paid the rental out of funds already appropriated by the Legislature. The Legislature apparently expected the cooperation of the state agencies in obtaining leased premises, and appropriated funds for such leased premises, but the fact that there is a disagreement between the Board and an agency concerning the occupancy of certain premises, should not, in our view, preclude the State's liability for rental of the premises occupied by an agency as a holdover lessee. A claim for rent of premises under such circumstances is not barred by the Constitution as there was pre-existing law upon which to base the claim.

■ The State also argues that Risley, the Executive Director, had no authority to contract with the bank for the lease rental during the period of holding over, and cites *State v. Steck Co.,* 236 S.W.2d 866, 869 (Tex.Civ.App.—Austin 1951, writ ref'd). We agree that Risley's only authority was to act in behalf of the Commission and at its discretion. We are not to be understood as saying, however, that the Commission itself was without authority to hold over the premises from month to month until suitable premises were available. It is undisputed that the Commission acquiesced in the holding over. The question arises, however, that when the Commission determined it could not discharge its statutory duties by moving to the Riverside Drive premises, what should it have done? It had a budget item appropriated to pay lease rental, but its written lease had expired. It appears the Commission became a tenant at will by holding over because of circumstances beyond its control, and under its lease rental contract the bank, as lessor was granted the remedies provided by law for the recovery of its rent. If the Commission was authorized to contract for lease rental (as it was), we have been cited no authority why it could not remain in possession until adequate and suitable premises could be obtained.

The Commission had authority to enter into the lease rental contract involved here, and it has been held that a county may be held liable upon an implied contract or *quantum meruit* for the reasonable value of benefits it has received where it had the authority or power to enter into the contract originally. *Rodgers v. County of Taylor,* 368 S.W.2d 794, 797 (Tex.Civ.App.—Eastland 1963, writ ref'd n. r. e.).

It was said in *Hayward v. City of Corpus Christi,* 195 S.W.2d 995, 1004 (Tex.Civ.App.—Waco 1946, writ ref'd n. r. e.), " ' . . . where, under a contract which is merely invalid and not fraudulent or malum in se,

one has furnished to a municipality, or other political subdivision, real or personal property . . . which property the public fails to pay for, he may upon equitable terms recover it in specie . . .,' " and further " 'The obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.' "

In *City of Houston v. Finn,* 139 Tex. 111, 161 S.W.2d 776, 777 (1942), the Supreme Court held:

> "It is the settled law in this State, as established by the decisions of this Court, that where a municipality knowingly receives property or services on an agreement which it had power to enter into as a contract, but which was not legally entered into so as to make it binding as a contract, it will be compelled to pay the reasonable value of the property or services so received, as on an implied contract."

It is said in *Harris County v. Emmite,* 554 S.W.2d 203, 204 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ dism'd): "Where a county or a municipality receives benefits under a contract, illegal because not made in conformity with the Constitution or statute of the state, or charter provision of the city, it will be held liable on an implied contract for the reasonable value of the benefits which it may have received."

■ While we find no cases which make the above propositions applicable to counties and municipalities also directly applicable to the State, it does appear reasonable that when an agency of the State is authorized to contract for rental space and finds it necessary to hold over beyond the period of the written lease the State should pay for the reasonable value of the benefit it received. Counties and municipalities are creatures and subdivisions of the State. *Security Trust Co. v. Lipscomb County,* 142 Tex. 572, 180 S.W.2d 151, 159 (1944).

The State here consented to be sued by the bank, and it has been held that "When the State authorizes a party to sue the State and becomes a party to that litigation, it occupies the same position as any other litigant." *State v. Stanolind Oil & Gas Co.,* 190 S.W.2d 510, 512 (Tex.Civ.App. —Beaumont 1945, writ ref'd); *Anderson, Clayton & Co. v. State,* 122 Tex. 530, 62 S.W.2d 107, 110 (Tex.Com.App.1933, opinion adopted); *State v. Jasco Aluminum Products Corp.,* 421 S.W.2d 409, 410 (Tex.Civ. App.—Austin 1967, no writ).

In the old case of *State v. Cloudt,* 84 S.W. 415, 416 (Tex.Civ.App.—San Antonio 1904, writ ref'd), the court said:

> "When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; *and her rights are determined and fixed by the same principles of law and equity,* and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals." [Emphasis added.]

The above language from *State v. Cloudt* was approved and quoted by the Supreme Court in *Wortham v. Walker,* 133 Tex. 255, 128 S.W.2d 1138, 1145–6 (1939).

Again in *Harris v. O'Connor,* 185 S.W.2d 993, 998 (Tex.Civ.App.—El Paso 1944, writ ref'd w. o. m.), the court said:

> "The State at all times voluntarily appears before her courts. If she elects to so appear, there are no special privileges to be accorded by the courts. To accord the State any such special privileges would defeat the purpose of the appearance. The government is bound by law just as the citizen."

The court in *Railroad Commission v. Arkansas Fuel Oil Co.,* 148 S.W.2d 895, 898 (Tex.Civ.App.—Austin 1941, writ ref'd), said:

> "It is likewise a general rule that when the State enters the courts as a litigant it casts off its robe as a sovereign, comes as would an individual litigant, and is bound by the judgment rendered as would an individual litigant."

The State has given its permission to be sued for lease rentals in this matter, and the Legislature had, before the beginning of the lease rental period involved here, appropriated funds with which to pay rentals for the Commission for its central office. Under the record presented here we are of the opinion that the claim here for rent by the bank against the State is not prohibited by the Constitution, nor do we believe it to be in conflict with the decisions in *Austin National Bank v. Sheppard*, supra; *Fort Worth Cavalry Club v. Sheppard*, supra, and cases there cited; and *State v. Steck Co.*, supra. The State's first point is overruled.

■ The second point of error complains that the trial court erred in refusing to grant the State's motion to disregard special issue two. This point is overruled. The record discloses that the Commission determined that the premises at 105 Riverside Drive were not in conformity with the needs of the Commission for its use as its central office. The jury agreed. It was a finding that the Commission had a valid reason for holding over. It is noted that Art. 666b, Sec. 6, (as amended 1977), provides that *"The board may not enter a lease contract under this Act unless it complies with the provisions of [Article 678g, Vernon's Texas Civil Statutes]."* [Emphasis added.] Art. 678g, Texas Revised Civil Statutes (originally effective 1970, as amended through 1977) provides in 2(c) that the "standards and specifications [set forth in the Act] shall be adhered to in all buildings leased or rented in whole or in part for use by the state under any lease or rental agreement entered into on or after January 1, 1972," and Sec. 3(a) and (b) provide "This act is concerned with nonambulatory disabilities, semiambulatory disabilities, sight disabilities, hearing disabilities, disabilities of coordination and aging. It is intended to make all buildings and facilities covered by this Act accessible to, and functional for, the physically handicapped to, through, and within their doors, without loss of function, space or facilities where the general public is concerned."

Sec. 1 of Art. 678g, supra, set out the policy of the State in constructing and leasing buildings and facilities for use by handicapped persons: " . . . to encourage and promote the rehabilitation of handicapped or disabled citizens . . . to eliminate, insofar as possible, unnecessary barriers encountered by aged, handicapped or disabled persons, whose ability to engage in gainful occupations or to achieve maximum personal independence is needlessly restricted when such persons cannot readily use public buildings." There follows in the statute specific criteria for design, site development, ramps, entrances, doors, stairs, floors, toilet rooms, water fountains, public telephones, elevators, switches and controls, identification for the blind, warning signals and hazards. Although these statutes may have been enacted after the execution of the lease in question here, they demonstrate the intent of the Legislature in providing buildings and facilities for the use of handicapped persons. The Commission, in our view, had the same purpose and intent in refusing to occupy premises which were unsuitable.

■ In its point three the State says the trial court erred in failing to grant its motion for judgment non obstante veredicto because there was no fact question for the jury, and the questions were only law questions which should have been decided by the court in favor of the State. This point is overruled.

The judgment of the trial court is affirmed.