UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court,
District of Columbia.

Dec. 7, 1983.

· James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Richard Levine, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Howard J. Trienens, Jim G. Kilpatric, John D. Zeglis, Francine Berry, New York City, for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Ameritech [1] has moved the Court for clarification of that aspect of the decree which concerns the treatment of so-called undesignated traffic. The motion raises the question of the obligations of the Operating Companies under the decree with regard to inter-LATA calls made by subscribers who do not designate an interexchange carrier either by presubscription or by use of an access code. See *infra*. This is by no means an insignificant issue: the estimates of traffic that will not be designated, at least at the outset, range up to 90 percent of all subscribers, and according to some, it will represent billions of dollars in revenue annually.[2]

Ameritech requests permission to route all undesignated traffic to AT & T, and it is supported in that stance by the Department of Justice and, naturally, by AT & T. With equal predictability, several of AT & T's competitors are opposed to that option, and they suggest two alternatives: (1) that the Operating Companies be required to "block," that is, not to complete, the call of any customer who has not designated an interexchange carrier so as to force him to make a designation, or (2) that the Operating Companies be required to distribute such calls among all the interexchange carriers on the basis of some appropriate formula.[3] In its Opinion of July 8, 1983, the Court deferred a decision on this issue pending a review by the various interested parties of the legal and practical implications of the several alternatives. 569 F.Supp. at 1109 n. 227. These issues have now been developed in several briefs responding to the Ameritech motion.

### I

To understand the issues raised by the motion, one must first understand the cur-

---

**1.** American Information Technological Corporation is the holding company for the Illinois, Indiana, Michigan, Ohio, and Wisconsin Operating Companies. Other Bell companies (*e.g.,* South Central Bell, Southern Bell, Bell Atlantic, NYNEX) have filed memoranda in support of the Ameritech motion.

**2.** See Ameritech Motion at 8; MCI Memorandum at 2–3.

**3.** The Court mentioned these options in its July 8, 1983 Opinion, when it expressed the tentative view that the allocation of all non-preselected calls to AT & T might be inconsistent with the decree. See *United States v. Western Electric Co.,* 569 F.Supp. 1057, 1109 n. 227 (D.D.C.1983).

rent procedures for routing traffic to interexchange carriers and the procedures which will be implemented in the future under the decree.

At the present time, because of limitations on the Operating Companies' switching facilities, only one carrier—AT & T—may be reached without the use of a multiple-digit access code. A customer can place an interexchange call through AT & T by dialing 1 or 0 plus a normal ten-digit number,[4] for a total of eleven digits. If a customer wishes to place a call through any other interexchange carrier, however, he must dial a twelve-or thirteen-digit access code plus the ten-digit number, for a total of twenty-two or twenty-three digits. Since this "substantial disparity in dialing convenience has had a significant adverse impact on competition," [5] the decree mandates equality of access by all carriers by the following process.

The decree provides [6] that the Operating Companies shall, on a gradual basis, furnish AT & T's competitors access that is "equal in type and quality" to that offered to AT & T, beginning not later than September 1, 1984,[7] and ending by September 1, 1986. Equal access will be phased in as various Operating Company end offices acquire the necessary switching capability.

As a particular end office reaches the equal access stage,[8] any subscriber may choose one of two options for the routing of his interexchange calls: (1) he may dial a four-digit carrier access code ("10XX") instead of the twelve-to-thirteen digits now required,[9] or (2) he may predesignate a primary interexchange carrier, that is, he may opt for a switching arrangement by which his interexchange calls will be routed automatically to the selected carrier.

Two points should be noted, however. First, a subscriber will not be limited to the carrier to which he has presubscribed: he may still reach any other interexchange carrier by dialing that carrier's four-digit access code.[10] Second, except for AT & T, which will remain available as a carrier of last. resort (see *infra*), a customer will generally not be able to access an interexchange carrier, either by predesignation or by use of a code, unless he first establishes an account with that carrier.[11]

The issue before the Court relates primarily to the period between September 1, 1984 and September 1, 1986 when equal access will be phased in on an end office-by-end office basis. It is assumed that by that time many, if not most, telephone subscribers will have elected to do nothing: they will not have made arrangements with

---

4. The applicable area code and the seven-digit local number.

5. *United States v. AT & T*, 552 F.Supp. 131, 161, 197 (D.D.C.1982).

6. Appendix B of the decree, section A(2). See generally, *United States v. AT & T*, 552 F.Supp. 131, 196–98 (D.D.C. August 11, 1982), *aff'd sub. nom., Maryland v. United States*, — U.S. —, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *United States v. Western Electric Co., supra*, 569 F.Supp. at 1107–09.

7. The decision with respect to undesignated traffic is appropriately made now because plans for equal access need to be and are being made by the Operating Companies at the present time. See Memorandum of Bell Atlantic at 3 (trial of equal access procedures to begin in May 1984).

8. Because the several switching machines contained in central office buildings may be converted to provide equal access at different times, equal access may become available to some

subscribers in a particular area (or even in the same apartment building) that will not be available at the same time to others in the same area.

9. To equalize the system, a caller who makes an interexchange call through AT & T will, from that time on, also be required to use a four-digit access code. Calls through a predesignated carrier will require only a single digit, however.

10. Some customers may decide to use four-digit dialing (even though they may be presubscribed to a different carrier) as a means of routing their interexchange calls through the lowest-cost carrier serving a particular route.

11. In the future, there will yet be a third and final stage to equal access. At such time as the national numbering (area code) plan is revised by the Federal Communications Commission, the Operating Companies will be required to provide access to all interexchange carriers through a uniform number of digits. It is unknown when the Commission will revise the plan.

an interexchange carrier, either by presubscribing to it or by establishing an account which would enable them to reach it through a four-digit access code. The question before the Court is—should all such traffic remain with AT & T or should the Operating Companies require their customers to make a choice among the interexchange carriers?

## II

The various interexchange competitors of AT & T [12] argue that the decree contemplates an end to the favorable treatment accorded AT & T by the Operating Companies; that the automatic routing of all undesignated traffic to AT & T would perpetuate that company's dominant role in the interexchange market; and that Ameritech's proposal therefore conflicts with the bedrock principles underlying the decree.

That argument has substantial weight, and were there no compelling countervailing considerations, the Court would be strongly inclined to accept it. But countervailing considerations do exist, of several types: language in the decree itself; expressions of the Court and of the parties with respect thereto; and various practical considerations as they affect the public.

Section A(2)(i) of Appendix B of the decree, while permitting an interim dialing disparity between AT & T and the other interexchange carriers, requires exchange access for these carriers through minimum access codes, and section A(2)(ii) requires the Operating Companies to

> offer ... access that permits each subscriber automatically to route, without the use of access codes, all the subscriber's interexchange communications to the interexchange carrier of the customer's designation.

Ameritech contends that these provisions imply that when a customer neither presubscribes nor dials a 10XX access code, the call is to be completed through AT & T.[13]

Ameritech also relies on a statement in the Court's August 11, 1982 Opinion that allowed continued dialing inequality because of provisions in the decree which require the Operating Companies to "permit" subscribers to route their calls to interexchange carriers other than AT & T, and on another which described presubscription as an "option." See 552 F.Supp. at 198 and at n. 279.

The Department of Justice, for its part, explained its understanding of the meaning of the decree when it stated early on—in May 1982—that under section A(2)(ii), the presubscription option "would not apply to AT & T [but would] allow exchange customers the right to substitute another carrier for AT & T ... if no other designation is made ...." Response to Comments at 105. In other words, in the Department's view, expressed shortly after the decree was published, customers were to be given merely the option of selecting a carrier other than AT & T; however, if they did not exercise the option, AT & T would retain the traffic. AT & T also espouses this understanding of the decree. Response at 2.

The Court did not contradict that interpretation in its August 11, 1982 Opinion, but, if anything, tended to support it. Accordingly, the interpretation of the agreement by the parties who negotiated it represents a substantial indication of their intent, and for that reason is entitled to weight. See, e.g., *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Eastmount Const. Co. v. Transport Mfg. & Equipment Co.*, 301 F.2d 34, 39 (8th Cir. 1962).

Normally, the Court would not regard these factors as conclusive because they conflict with the basic purpose of the decree—to place all interexchange carriers on an equal footing. However, the conclusion to which they point is further supported by

---

12. Briefs have been submitted by GTE Sprint, MCI, ITT, Satellite Business Systems, U.S. Telephone, ALTEL, and Microtel.

13. Ameritech Motion at 5–7; see also, e.g., letter of Southwestern Bell dated September 23, 1983, at 4.

the fact that the alternatives to the continued assignment of undesignated traffic to AT & T immediately upon the achievement of equal access suffer from substantial practical difficulties.

### III

One of the two suggested alternatives to routing all undesignated traffic to AT & T,[14] is the allocation of that traffic among all the interexchange carriers. This alternative suffers from defects which, in the opinion of this Court, render it entirely unsuitable.

First. There is some question whether allocation is as compatible with the purposes of the antitrust laws as its proponents suggest. These laws are intended to protect the competitive process, not to assure positive results for competitors. See, e.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir.1976); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 299 (7th Cir.1974); see also, *United States v. AT & T,* 552 F.Supp. 131, 174 n. 183 (D.D.C.1982). There is force, therefore, to Ameritech's point that the decree should be interpreted as a means of fostering a fair competitive process rather than as a device for manipulating the results of that process, and that the allocation option would accomplish the latter rather than the former.[15]

Second. A more serious flaw in the allocation proposal is that many of the interexchange carriers are not prepared, technologically or otherwise, to receive all the customers [16] that may be allocated to them by the Operating Companies. Specifically, it appears that in many LATAs in which, under this scheme, calls would be randomly assigned, several carriers would be unwilling or unable to accept all customers assigned to them, because of the frequency of those customers' calls, their economic circumstances, their location, or their inability to pay a presubscription fee or a particular monthly service charge.[17] Other carriers would lack the ability to terminate service to every telephone in the network, to provide billing through the Operating Companies, or to accommodate the interexchange traffic of all assigned customers.

Among the inevitable byproducts of an allocation plan would be the difficulties associated with the issuance of bills to customers on behalf of carriers which the customers had expressed no desire to use.[18] Any relationship between the wishes of a particular customer with regard to such matters as service, quality, and price options, and the options actually made available by the assigned carrier would be purely coincidental.

---

**14.** Several of the intervenors (*e.g.*, ITT) would place the burden of developing specific allocation plans or other alternatives on the Operating Companies. But these entities have proposed their own plans, and it is not unreasonable to expect those dissatisfied with those solutions to make their own legally sound, practical proposals. Their failure, by and large, to do so, suggests that it is not possible to come up with anything better or more realistic than what has been suggested thus far.

**15.** Ameritech Motion at 11. On the other hand, the Court regards as absurd Ameritech's reliance on "free market principles" to justify its routing to one company—AT & T—all traffic not designated to go elsewhere. See Ameritech Motion at 9.

**16.** The Operating Companies appear to lack the switching capabilities necessary to allocate traffic on a call-by-call basis but must instead effect allocations on a customer-by-customer basis. See Ameritech Memorandum at 15 n. *.

**17.** Some carriers serve only limited geographic areas and others are willing to accommodate only certain types of customers (*e.g.*, business customers or those generating a high volume of calls). A number of carriers apparently impose subscription charges which are fairly substantial in relation to the monthly bills of occasional users of long distance. Although challenged to do so by Ameritech, no carrier has committed itself to handling all calls from blocked customers who had not previously established accounts.

**18.** There would also be the concomitant problem that customers would never have agreed to pay the charges imposed by the particular carrier.

At best, therefore, the allocation scheme would be disruptive and cause a great many customer-carrier disputes; at worst, it would be totally unworkable in a substantial proportion of the transactions.

Third. Assuming that these difficulties could, somehow, be overcome, there remains a final obstacle to the allocation scheme: the adoption of a fair formula. The various proponents of the allocation plan have suggested different methods of implementation. Each of these methods, however, suffers either from the defect that it is tailored to the particular proponent's strengths and would substantially disadvantage other interexchange carriers, or from the flaw that it represents merely a vague concept, with the vital and difficult details left unaddressed.

For example, MCI proposes that the allocation reflect the percentage of subscribers who had previously designated a particular carrier. Opposition at 5 n. *. This would, of course, disadvantage those carriers which are just starting out and are still in the process of building a subscriber base.[19] Moreover, MCI does not address the problem of whether the number or the availability of carriers will change over a period of time,[20] or the question of whether the formula should be based on nationwide designations, designations from the territory of a particular Operating Company, or designations on a LATA-by-LATA basis.[21]

Satellite Business Systems and Western Union avoid the problems inherent in the production of a formula by simply demanding that the Operating Companies be required to establish "reasonable eligibility criteria" for carrier participation;[22] ITT suggests that an approach similar to that used in international communications might work, predicting that the Court "may be able to smooth out the operation of an allocation arrangement through ... an [undefined] economic benefit approach" (Response at 9); and U.S. Telephone recommends the adoption of an equally undefined "reasonable, non-discriminatory scheme." Response at 5.[23]

Unless the Court were to establish its own allocation scheme—a task that would seem to be as foreign to its Tunney Act responsibilities as it would be fraught with the same practical obstacles which have thwarted the efforts of AT & T's various competitors—it would have to require each Operating Company to devise and implement its own plan. While as indicated in note 39 *infra*, the Court sees no basis for prohibiting the Operating Companies from undertaking this task if they are willing to do so despite the ensuing problems,[24] it will not impose such a requirement upon them.[25]

Accordingly, the Court rejects the allocation alternative.

## IV

When a call is blocked, it is not completed. Several of AT & T's competitors pro-

19. There is also no reason to believe that the preferences of high users, some of whom have already chosen a particular interexchange carrier, will be identical to the low users who are less likely to preselect a carrier.

20. *I.e.,* the problems arising from the fact that some carriers may be expected to enter, others to exit, all or parts of the market.

21. Since some carriers are more heavily concentrated in some geographic areas, each of these plans would presumably yield a different result.

22. Opposition of SBS at 8; see also, Western Union Response at 8–9. Criteria that SBS has defined include such factors as the ability to terminate the traffic via owned or leased facilities in all LATAs and the availability of the necessary inter-LATA facilities to handle the al-

located traffic. It may be assumed that the less well-established carriers would regard this plan as discriminatory.

23. GTE Sprint has realistically refrained from submitting an allocation proposal.

24. U.S. Telephone, in addition to leaving the formulation and adoption of a plan to the Operating Companies, has threatened that "[i]f the proposal is anti-competitive, objections will surely be registered." Response at 4–5.

25. Allocation by the Operating Companies could also lead to the establishment of close and possibly anticompetitive relationships between those companies and selected carriers.

pose that when a caller who has neither presubscribed nor dialed a carrier access code attempts to make an interexchange call, he be referred to a recorded announcement from his Operating Company advising him to dial the company's business office or an "800" number to obtain additional information. If the customer complied, he would be given the access codes of several interexchange carriers, and this would enable him to select a carrier [26] and thereafter to complete his call. Call completion would not be certain even at that juncture, however, for if the caller did not have an account with the particular carrier, he might not be accepted on such short notice, if at all.[27]

These difficulties would, of course, be aggravated if the interexchange call were attempted during a holiday period (when a peak calling load traditionally occurs) or in an emergency (when the caller cannot wait for intricate subscription arrangements). Moreover, problems would be particularly likely for those who, on account of inexperience, age, indigency, language difficulty, and the like would not have made a selection in advance, but would have to do so on a moment's notice.[28]

Since, as indicated above, a very substantial proportion of the subscribers would probably not select an interexchange carrier at the time equal access becomes a reality for their particular areas, it may be expected that this scheme would at that time cause a great deal of difficulty [29] and confusion.[30] Indeed, many individuals, faced with the complications described above, would simply hang up, never to complete their calls.[31]

While some of the adverse impacts on the public from divestiture have been exaggerated, it is a fact that the reorganization, affecting as it does every single household in the United States, will present some complications to consumers in the short run.[32] It is important, however, and clearly in the public interest, that such practical problems be held to a minimum. Certainly, if a choice must be made between accommodating the interests of the public and those of the various competitors in the interexchange market, the interests of the public must take precedence. For while the protection and fostering of competition is the goal of the antitrust laws, it is that goal merely as a means to a broader objective—the promotion of the interest of the consuming public. See, *e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) ("the antitrust laws were enacted for 'the protection of *competition* not *competitors* ' ").[33]

---

**26.** If the caller wished to make an intelligent choice—that is, a choice based on rates, options, deployment—he would obviously have to call several of the carriers.

**27.** At the present time, almost all carriers require that a customer establish an account before they will handle his call.

**28.** Frequent callers, such as business enterprises, could be expected to presubscribe early on.

**29.** The telephone network, too, would be adversely affected. Blocking may be expected to result in numerous customer calls for assistance, thus overloading the facilities of the Operating Companies, at least for the short run. See Southwestern Bell letter of September 23, 1983 at 5–6; AT & T Response at 10–11.

**30.** According to estimates, some six to nine million subscribers could be denied access to long distance between 1984 and 1986, at least for a time. South Central Bell Memorandum at 13.

**31.** According to Ameritech, 26 percent of customers who are unable to complete their calls do not attempt to redial. Ameritech Memorandum at 13.

**32.** For example, a subscriber may hereafter have to deal with more than one carrier; the monthly statements, which must be broken down more exactly, will be somewhat more voluminous than they were in the past; and a subscriber, rather than to pay a monthly rental fee for his telephone instrument, now has the choice, and therefore the bother, of a rental or a purchase, and a purchase, moreover, from more than one supplier and retailer.

**33.** The Court considered factors other than those directly related to the competitive stance of the interexchange carriers and the manufacturers of telecommunications equipment when it refused to restrict the Operating Companies from engaging in directory advertising and approved a provision which permitted them to

Finally, it is not irrelevant that AT & T is now and will continue to be the carrier of last resort. It offers service to all subscribers, regardless of their circumstances, the frequency of the calls, or the places they call. That fact appears to have been considered by the parties at the time of the entry of the decree, and it bears on the issue whether a blocking rule should be required immediately upon the availability of equal access. The continued availability of a carrier everyone will be able to use is in the public interest and should therefore be encouraged.[34] Moreover, there would be some question as to the fairness of a system which at the first available opportunity required universal blocking of all undesignated calls but left AT & T's competitors free to accept or reject the blocked subscribers while AT & T had to continue to accept them all.[35]

For these reasons, the Court is not prepared to construe the decree so as to impose the substantial burdens of a blocking rule upon the public immediately upon the achievement of equal access unless such a construction were plainly required. As explained above, no such requirement is explicit or clearly implicit in the decree.

## V

The Court recognizes, of course, that this ruling may be of substantial assistance to AT & T.[36] For the reasons stated, that is a result that cannot initially be avoided without exorbitant costs to the public. It does not follow, however, that the Court, consistently with the promotion of competition, should not require the Operating Companies to make reasonable efforts to acquaint customers with their options with regard to interexchange service or that it should not take steps to preclude AT & T from receiving the calls of undesignated customers in perpetuity. Such measures are, indeed, entirely appropriate.

There is a substantial difference between a forcible assignment of customers to specific interexchange carriers, on the one hand, and the development of public information regarding the availability of such carriers, on the other. Likewise, although it may be unreasonable to require all telephone subscribers immediately upon the availability of equal access in a particular area to designate interexchange carriers on account of an event—divestiture—with which they have no direct concern or relationship, it is not inappropriate to expect them to make such designations at a time when they will be involved with the telephone company, and the services it provides, for other, unrelated, reasons [37] in any event.[38]

provide billing services to AT & T. 552 F.Supp. at 193–94, 198–99. The Court has also noted, quoting *United States v. American Tobacco Co.,* 221 U.S. 106, 185, 31 S.Ct. 632, 650, 55 L.Ed. 663 (1911), that antitrust violations "should be remedied 'with as little injury as possible to the interests of the general public' ...." 552 F.Supp. at 150. The Court rejects Western Union's suggestion (Response at 7) that considerations of cost and customer convenience should be ignored.

**34.** AT & T has stated that it "may not always be willing to provide service to the occasional user." Response at 14 n. *. The Court's decision herein is based on all of the factors listed above. Should there be a change with respect to any of them, *e.g.,* the continued availability of AT & T as a carrier of last resort, that decision will be subject to reexamination.

**35.** The non-presubscribers will probably be poorer and less educated and undoubtedly a greater burden on the interexchange carriers than the large, bulk business users who will have presubscribed at the outset.

**36.** AT & T contends that this entire matter is of limited economic importance. Response at 1. That argument is both disingenuous and unpersuasive (see p. 669 *supra*). There is likewise no reasonable basis for Ameritech's speculation that most customers who will place undesignated calls would choose to continue their relationships with AT & T if blocking forced them to designate a carrier. Motion at 8–9. Ameritech cannot know this nor can the Court or anyone else.

**37.** At such a time, moreover, an Operating Company representative will presumably be available in person or by telephone to explain the various options and to answer questions.

**38.** Additionally, the demands on the human and equipment resources of the Operating Companies required by the blocking-and-referral pro-

## VI

On the basis of these considerations, the Court hereby grants Ameritech's motion, and it construes the decree, pursuant to the authority vested in it by sections VII and VIII(I) of the decree, as permitting [39] each Operating Company to route to AT & T the calls of any customer who, by the time equal access is available, has failed to make a selection of an interexchange carrier either by predesignation or by dialing an access code. Such permission is limited, however, as follows.

First. Each Operating Company shall, during the ninety days immediately preceding and the ninety days immediately following the availability of equal access at any end office, inform its customers who receive service from such office, of their options with respect to the various interexchange carriers.[40] This Operating Company information[41] shall include (a) reasonably detailed data concerning AT & T and its competitors serving the area, (b) advice

to the customer to the effect that his present designation of an interexchange carrier will be free of charge, but that a subsequent designation may require payment of a fee,[42] and (c) advice to the customer that if he does not make a designation, he may subsequently be able to complete an interexchange call only by making a carrier selection at that time through the possibly cumbersome method described at pp. 13–15 *supra*. But see note 47 *infra*. Such information shall be provided to the customers at a minimum by way of inserts in the monthly bills.[43]

Second. During the ninety-day period immediately following the achievement of equal access, each Operating Company shall allow each of its customers in the area being converted to equal access the opportunity to predesignate an interexchange carrier free of charge.[44]

Third. Following the ninety-day period referred to above, each Operating Company shall again allow a predesignation free

cedure would obviously be far more manageable if it had to be met only on a gradual basis than if it were required to be implemented on the day or the days following equal access.

**39.** The Court rejects AT & T's position that the Operating Companies be *required* to channel all undesignated traffic to AT & T. AT & T's suggestion that a nationwide solution to this problem is necessary (Response at 12 n. *) is supported neither by citation of authority nor by logic. The Department of Justice has concluded that nothing in the decree prohibits an Operating Company from requiring predesignation or impairs the appropriate regulatory body from imposing such a requirement (Response of United States at 2). The Court likewise finds no basis in the decree to preclude an Operating Company from employing either the allocation or the blocking option should it choose to do so.

The Court accordingly, grants the motion of the Northwest Operating Companies which requests for the Operating Companies the freedom to make such choices. Obviously, however, any problems associated with allocation or immediate blocking—in terms of practicability, customer dissatisfaction, or claims of favoritism—will be those of the companies which make such choices.

**40.** See Ameritech Motion at 12; Ameritech Reply Memorandum of September 26, 1983 at 3–4; Southwestern Bell letter of September 23, 1983 at 2; AT & T Response at 3–4.

**41.** It may be expected that the interexchange carriers themselves will, as in the past, mount their own advertising campaigns and perhaps intensify these efforts just before and just after the achievement of equal access. The Operating Companies will be expected to assist the interexchange carriers by means of such measures as making lists of non-presubscribed customers available to them.

**42.** Tariffs governing the charges for the direct routing of the calls of customers to interexchange carriers have apparently been submitted by the Operating Companies to the Federal Communications Commission. The regulation of such charges is, of course, a matter for the Commission. See also, 552 F.Supp. at 198 n. 279.

**43.** Compare Opposition of GTE Sprint at 6–7. The Court does not affirmatively require compliance with all the specific suggestions in the GTE Sprint submission, but the Operating Companies are, of course, free to adopt one or more of them.

**44.** See also Response of the United States at 3 n. *. The access charge tariff filed with the FCC by Southern Bell Telephone (and presumably by other Operating Companies) allows a consumer ninety days to choose a carrier other than AT & T. U.S. Telephone Response at 7; GTE Sprint Opposition at 7.

of charge [45] and provide information similar to that required above, at the time a customer receives new service if he still has not designated an interexchange carrier at that time. The receipt of new service by a customer means that (1) he receives service from the particular Operating Company for the first time, or (2) he moves to another location within the Operating Company area.[46]

No Operating Company shall continue automatically to assign to AT & T the calls of a customer who receives new service but fails to designate an interexchange carrier although given an opportunity to do so pursuant to the procedures described above. The Operating Company may instead refer the caller to a recorded announcement advising him of the availability of interexchange carriers, or it may otherwise assist him in locating such a carrier, provided that no favoritism is shown to any particular carrier. Customers may, of course, at any time establish their own relationships with interexchange carriers they consider suitable and which are willing and able to accept their business.[47]

These procedures strike an appropriate balance.[48] Taking into account the language of the decree and the intention of the parties, they fulfill the fundamental purpose of the decree to promote competition and protect the legitimate interests of the interexchange carriers, without imposing unreasonable and unnecessary burdens on the public at large.

**45.** Operating Companies may charge for interexchange carrier selections made by customers at other times in accordance with their own schedules unless otherwise directed by the regulators. See note 42 *supra*.

**46.** Ameritech appears to contemplate that the blocking option be required only when a subscriber originally receives service (Motion at 14), and AT & T goes even further and would require that "new customers"—whatever that may mean—be informed merely that they "may" predesignate or use an access code. Response at 3 n. *. On that basis, it might take years, if not decades, before AT & T would completely relinquish its current advantage. There is no reason why the advent of competition in this regard should be so severely limited.

**47.** AT & T, as the carrier of last resort, will be available to these customers through its 10XX code, presumably without the need for an existing account. As competition increases, other carriers also may permit customers to use their services by merely dialing their 10XX access code. Accordingly, customers with new service who have not predesignated an interexchange carrier will still be able to make long distance calls. However, instead of simply dialing a 1 or 0 before the ten-digit number, they will have to dial a 10XX access code.

**48.** It appears that some twenty percent of the telephone customers receive new service annually. See Ameritech Motion at 14 n. **; Ameritech Reply Memorandum of September 26, 1983 at 3. Thus, as a result of these procedures, the advantage accruing to AT & T from the grant of the Ameritech motion should be largely dissipated in a relatively short period of time.