

# THE ATTORNEY GENERAL
# OF TEXAS

January 12, 1987

JIM MATTOX
ATTORNEY GENERAL

Mr. Marlin W. Johnston
Commissioner
Department of Human Services
P. O. Box 2960
Austin, Texas   78769

Opinion No.   JM-618

Re:  Authority  of the Department
of  Human  Services  to  select  a
long-distance  telephone  carrier
for  all  of  its  offices  with  a
single  letter  of  agency  without
violating FCC regulations

Dear Mr. Johnston:

As Commissioner of the Texas Department of Human Services, you
inquire about the effect of certain Federal Communications Commission
(hereinafter  FCC) . orders  regarding  the  divestiture  of  American
Telephone and Telegraph Company (hereinafter AT&T) on the purchase of
long distance telephone services by your agency.  A brief history of
the AT&T divestiture decrees must precede discussion of your specific
questions.

Until  recently,  AT&T  dominated  the  telecommunications  industry.
See generally United States v. American Telephone and Telegraph Com-
pany, 552 F. Supp. 131, 160-65 (D.D.C. 1982) (Modification of Final
Judgment), aff'd, sub nom. Maryland v. United States, 460 U.S. 1001
(1983) (hereinafter U.S. v. AT&T).  Through its Bell Operating
Companies, AT&T provided most of the country's local telephone service
and virtually all intrastate long distance service.  Through its Long
Lines Division, AT&T also provided most of the country's interstate
long distance service.  The physical connections between AT&T and
local companies are of high quality because the system was designed to
afford access to only one carrier -- AT&T.  Soon after the FCC
authorized other long distance carriers to compete with AT&T in
providing long distance service, these competing carriers began
demanding that local companies provide them with the same quality of
access given to AT&T.  The refusal of the local companies to provide
this access was one of the factors which lead ultimately to antitrust
actions in federal court.  See U.S. v. AT&T, 552 F. Supp. at 162-63.[1]

---

1.  Actually, antitrust litigation against AT&T has a long and
rather curious history which dates back to 1949.  See United States v.
American Telephone and Telegraph, 552 F. Supp. 131, 135-40 (D.D.C.
1982) (Modification of Final Judgment), aff'd, sub nom. Maryland v.
United States, 460 U.S. 1001 (1983).

The main antitrust litigation against AT&T resulted in a Consent Decree. See Modification of Final Judgment, Civil Action No. 82-0192 in the United States District Court for the District of Columbia (hereinafter MFJ or Decree); see also U.S. v. AT&T, 552 F. Supp. 131 (interpreting the decree). This Decree was intended to accomplish two basic goals: (1) structural changes removing AT&T as the dominant supplier of local telephone service by requiring AT&T to divest itself of its Bell Operating Companies, and (2) restrictions to prevent cross-subsidization and to prevent discrimination against AT&T's competitors. See U.S. v. AT&T., 552 F. Supp. at 141-42. With regard to restrictions to prevent discrimination, the Decree contains a clause requiring local exchange carriers to provide access that is "equal in type, quality, and price to that provided to AT&T and its affiliates." See MFJ, §II; U.S. v. AT&T, 552 F. Supp. at 171-72. Although the Decree does not establish specific requirements guaranteeing AT&T's competitors access to AT&T's high quality interexchange network, FCC decisions and regulations set forth specific equal access requirements. U.S. v. AT&T, 552 F. Supp. at 173. The FCC procedure for obtaining equal access gave rise to the current controversy.

In geographic areas where equal access orders are technically feasible, customers have been given the opportunity to choose a long distance carrier. The Decree allowed AT&T to keep customers who did not choose a different long distance carrier. United States v. Western Electric Company, 578 F. Supp. 668, 676 (D.D.C. 1983). At first, the FCC also allowed AT&T to keep "default" customers. Ultimately, however, the FCC reversed its position and required a pro rata allocation of default customers to various long distance carriers according to the percentage each carrier received of choosing customers. See Investigation of Access and Divestiture Related Tarrifs, CC Docket 83-1145, Phase I, FCC 85-69, 50 Fed. Reg. 9,462 (Mar. 8, 1985) (to be codified in 47 C.F.R. Ch. 1); Investigation, CC Docket 83-1145, Phase I, FCC 85-293, 50 Fed. Reg. 25, 982 (June 24, 1985) (to be codified in 47 C.F.R. Part 61); Investigation, CC Docket 83-1145, Phase I, FCC 85-293, 50 Fed. Reg. 38,200 (Sept. 20, 1985).

You indicate that the Texas Department of Human Services designated AT&T Communications as its long distance carrier with an "Appointment of Agent" letter. You indicate that Southwestern Bell Telephone Company requires independent election by each department location despite this letter of agency. Accordingly, you ask:

> 1. Do the provisions of the AT&T divestiture order require Southwestern Bell Telephone Company to obtain an election document for each department location?

> 2. If the answer to the first question is no, does the department legally need to execute any additional document to advise Southwestern Bell

Mr. Marlin W. Johnston - Page 3 (JM-618)

Telephone Company and AT&T of its election to continue with AT&T?

3. Does the Department of Human Services have any legal responsibility for long distance service from unregulated carriers selected by Southwestern Bell Telephone Company or its contractors to serve the department (a) before the date and (b) after the date of the department's formal election for AT&T to provide long distance service?

You also indicate that the department chose AT&T, a regulated company, in the belief that no competitive bidding was necessary to continue long distance service with AT&T. You suggest that an automatic allocation by Southwestern Bell would violate the state's competitive bidding requirements.

As indicated in the foregoing discussion, FCC regulations, rather than the court's divestiture decree, govern the equal access selection process through presubscription ballots and the allocation of customers who fail to select a long distance company. Customers may return ballots directly to local exchange carriers. The FCC also authorizes a "Letter of Agency Procedure" which gives customers the option of independently contacting a long distance company to make arrangements for long distance service. See Investigation of Access and Divestiture Related Tariffs, (Appendix B - Allocation Plan), 50 Fed. Reg. 25,982, 25,989 (para. 9). Paragraph 12 of the Allocation Plan requires local exchange carriers to accept from each long distance carrier a list of customers that have made individual arrangements with that long distance carrier. Id. at 25,989 (para. 12). The present controversy arose because the Department of Human Services is a multi-location and multi-line customer of long distance service. Apparently, Southwestern Bell expects each department location to independently choose a long distance carrier.

Your question depends on whether the FCC regulations authorize a multi-line customer to designate its primary long distance carrier with a single letter of agency. Paragraph 9 of the Allocation Plan states that "[s]ince ballots contain all of the customer's lines, the [long distance carrier] should encourage its customers to mail the [carrier] the ballots or mail them to the [local operating company]." Appendix B, at 25,989 (para. 9) (emphasis added). This suggestion is not couched in mandatory language. Moreover, paragraph 10.4 states that "[t]he specific telephone number[s] for which the primary [long distance carrier] is being designated must be listed" in the letter of agency. Appendix B, at 25,989 (para. 10.4). Thus, the letter of agency procedure is intended as an alternative to the individual ballot procedure. The FCC has not interpreted the letter of agency procedure to require that multi-line customers submit an election ballot in addition to a letter of agency — much less to require the submission of multiple ballots.

The FCC addressed the subject of your first question when it considered AT&T's petition for an interpretation of the Letter of Agency Procedure:

> AT&T states that customers presently place presubscription orders on a billed telephone number (BTN) basis. AT&T states that a BTN may have associated with it one or more additional lines or numbers and thus may represent hundreds or even thousands of lines . . . AT&T argues that it is cumbersome and unnecessary for customers to provide individual line detail.

Investigation, 50 Fed. Reg. at 38,202 (para. 10). The FCC agreed with AT&T's assertion:

> The Commission did not intend to impose unreasonable burdens on multi-line customers in their selection of an interexchange carrier. We conclude that the requirements set out [at paragraph] 10.4 of Appendix B may be fulfilled either by provision of BTNs or by other unambiguous customer description indicating the scope of the customer's designation of a primary [long distance carrier].

Id. at 38,202 (para. 11).

Accordingly, as long as the Department of Human Services included a list of its BTNs or some other unambiguous description indicating the scope of its designation of a primary long distance carrier in its letter of agency to AT&T, the department need not submit an election ballot for each department location. This designation of AT&T as the department's long distance carrier does not violate Texas' competitive bidding requirements. The State Purchasing and General Services Act exempts the services of public utilities from its competitive procurement requirements. V.T.C.S. art. 601b, §3.01(c)(4). At the present time AT&T, as the dominant long distance carrier, is a public utility. See V.T.C.S. art. 1446c, §3(c)(2). In light of the foregoing response to your first question, a response to your second question, regarding additional notification, is unnecessary.

You also ask whether the department is liable to long distance carriers assigned to various department locations through the FCC allocation process. Your request letter expresses concern about liability for service provided both before and after the department's formal election of AT&T as its primary long distance carrier through a letter of agency. You indicate, however, that the department elected AT&T within the final time limit prescribed by the FCC. Accordingly, it is not entirely clear how or why Southwestern Bell allocated various department locations to different long distance carriers prior

to the end of the time period allowed for the department's election.[2]   Resolution of this issue involves the scope of the department's contract with Southwestern Bell.   In contrast, your question requires a determination of whether an implied contract can be imposed directly against the state by the long distance carriers assigned to the state through the allocation process for long distance service.   You suggest that the state's competitive bidding statutes preclude an allocation of department locations to different long distance carriers.   Briefs submitted in response to your opinion request contend that the FCC's allocation process preempts the state's competitive bidding statutes.

As a preliminary matter, it is well-established that no state agency or state employee holds the authority to bind the state by contract unless authorized to do so expressly or by necessary implication in the Texas Constitution or statutes.   Tex. Const. art. III, §44; State v. Ragland Clinic-Hospital, 159 S.W.2d 105, 106 (Tex. 1942); see also Director of the Department of Agriculture and Environment v. Printing Industries Association of Texas, 600 S.W.2d 264, 265-66 (Tex. 1980) (doctrine of sovereign immunity prevents suit to subject the state to liability without express legislative consent).   Article III, section 44, of the Texas Constitution prohibits grants of public funds unless the grants are authorized by preexisting law.   In Ragland, an agent of the Texas Liquor Control Board agreed expressly to pay for an injured prisoner's treatment. Rejecting the hospital's claim, the court held that the board's employees lacked the express or implied authority to enter into the contract in question.   159 S.W.2d at 107.   The court rejected the argument that the agent had apparent authority to bind the state:

> Since the powers of all State officers are fixed by law, all persons dealing with them are charged with notice of the limits of their authority and are bound at their peril to ascertain whether the contemplated contract is within the power conferred.   There is no occasion or excuse in such a case for indulging in presumptions or in relying on appearances.   (Citations omitted).

Id.; see also Fazekas v. University of Houston, 565 S.W.2d 299, 304-306 (Tex. Civ. App. - Houston [1st Dist.] 1978, writ ref'd n.r.e.),

---

2.   It should be noted that the FCC's Allocation Plan states that, in order to use the letter of agency procedure, "[t]he [long distance carrier] must also agree to accept responsibility for any billing disputes arising from implementation of its customer list." Appendix B, at 25,989 (para. 11).

appeal dismissed, 440 U.S. 952 (1979); cf. Bache Halsey Stuart Shields, Inc. v. University of Houston, 638 S.W.2d 920 (Tex. App. - Houston [1st Dist.] 1982, writ ref'd n.r.e.).

To hold the Department of Human Resources liable directly to the various long distance carriers assigned to different department locations by Southwestern Bell would require a finding that each department location has the independent authority to bind the state to a contract. Carried to its logical conclusion, this line of reasoning could result in potentially unlimited state liability for implied contracts entered into by state employees. Although the Department of Human Services holds the authority to purchase long distance service, the department has not delegated this authority to the department's various locations. The fact that the head of the agency executed an agreement with AT&T for long distance service affirms that this power was not delegated. This fact also militates against the reasonableness of reliance on the silence of a regional office to constitute an implied contract.

In State v. City National Bank of Austin, 578 S.W.2d 155 (Tex. Civ. App. - Tyler 1979), aff'd, 603 S.W.2d 764 (Tex. 1980), the court considered the liability of the State Commission for the Blind for rent allegedly due for a period during which the commission occupied leased premises as a holdover lessee. The lessor sued for rent for the holdover period. The court noted:

> The Legislature authorized the Commission to contract for rental space and be the lessee. The written lease provides that the lessor shall have 'the remedies . . . provided by law for recovery of rent.' The Commission is an agency of the State, and the State is bound by its contract as a private citizen is bound by a like contract. (Citations omitted).

578 S.W.2d at 159. Because the legislature authorized the lease and because the lease authorized suit against the state, the court found no violation of the Texas Constitution article III, section 44, requirement that contracts be authorized by preexisting law. See id. The court mentioned several cases dealing with the theory of quantum meruit in holding the state liable for the reasonable value of the benefits received. 578 S.W.2d at 160-61. It is unclear, however, whether quantum meruit constituted the theory of recovery or merely the measure of damages. The Texas Supreme Court, in affirming the court's decision, held the "state liable under the terms of the written agreement for the damages occasioned by the default." State v. City National Bank of Austin, 603 S.W.2d 764, 765 (Tex. 1980) (emphasis added). Thus, although the Supreme Court held the commission liable, the court did not rely on the quantum meruit theory or on an implied contract theory.

The City National Bank case clearly differs from the case at hand. The Department of Human Services has not entered into contracts with the different long distance carriers to which Southwestern Bell allocated the various department locations. To hold the department liable directly to these carriers would require holding the state liable for a contract implied from the department's non-action in circumstances beyond the department's practical control. This situation is not the equivalent of a hold-over lessee's situation. Although the department may have actually used long distance service from allocated long distance carriers, it took no action to indicate its desire to change existing service from AT&T to various other long distance carriers. In fact, department employees may have been totally unaware of the point at which long distance service was physically transferred. After executing a letter of agency with AT&T, the department indicated affirmatively that it did not want primary service from other long distance carriers. Additionally, as indicated above, the individual department locations lack the authority to enter into any contracts, express or implied. Accordingly, although the existence of an implied contract depends upon factual determinations beyond the scope of the opinion process, an implied contract between the department and allocated long distance carriers cannot exist in the instant case.

Consequently, the department is not legally liable directly to long distance carriers allocated to various department locations as "default" customers under FCC regulations. This opinion does not address whether the department may be liable to Southwestern Bell, it addresses only the department's liability to long distance carriers allocated to the department by Southwestern Bell.

## S U M M A R Y

As long as the Texas Department of Human Services included a list of its billed telephone numbers or some other unambiguous description indicating the scope of its designation of a primary long distance carrier in its letter of agency to American Telephone and Telegraph Company, the department need not submit an election ballot for each department location. This designation does not violate Texas' competitive purchasing laws.

The department is not legally liable to long distance carriers allocated to various department locations as "default" customers under Federal Communications Commission regulations.

Very truly yours,

JIM MATTOX
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jennifer Riggs
Assistant Attorney General